[Crim. No. 33432. Second Dist., Div. Three. Jan. 11, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID LEE BARBEN, Defendant and Appellant.

**COUNSEL**

Rust & Armenis and Thomas G. Minder for Defendant and Appellant.

Robert W. Parkin, City Prosecutor, and Gerry L. Ensley, Deputy City Prosecutor, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Following a jury trial in the Long Beach Municipal Court, defendant David Lee Barben (Barben) was convicted of violating section 4050 of the Business and Professions Code.[1] That section, with exceptions not relevant here, makes it a misdemeanor for any person "to manufacture, compound, sell or dispense any drug, poison or chemical, or to dispense or compound any prescription of a medical practitioner unless he is a registered pharmacist under the provisions of [chapter 9 of division 2 of the Business and Professions Code]."[2]

---

[1]Hereinafter all code section references are to the Business and Professions Code.

[2]The punishment prescribed for a violation of section 4050 is found in section 4382.

Upon appeal to the appellate department of the superior court, Barben succeeded in obtaining a reversal of his conviction. Pursuant to rule 62 of the California Rules of Court, we ordered transfer of the cause to this court to settle an important question of law. As will be developed in the discussion to follow, we hold that Barben's conviction must be reversed since section 4050 is unconstitutionally vague as applied in the case at bench.

FACTS

On September 14, 1976, Barben was employed at an adult bookstore where a bottled product, labeled "Locker Room," was offered for sale. "Locker Room," which retailed for $6, was a room odorizer whose function was to reproduce the odor associated with its name.[3] On the day in question, a police officer purchased a bottle of "Locker Room" from Barben, who was at the time neither a registered pharmacist nor working under the direction of one; this action followed.

Barben was prosecuted under the portion of section 4050 which prohibits the sale of a "poison" by any person other than a registered pharmacist.[4] At Barben's trial, evidence was received showing that chemical analysis had revealed "Locker Room" to contain from 12 to 16 percent butyl nitrite. The jury was instructed that butyl nitrite is subject to the provisions of section 4050 since it is defined as a poison by section 4160.[5] The trial court rejected an offer of proof by Barben designed to show that butyl nitrite has no pharmaceutical use or application.

[3] The text on the bottle read as follows: "LOCKER ROOM® *Aroma of Men.* Net Weight .3 oz. Directions: Remove cap, place in desired location and the aroma of a locker room will develop. Distributed by: West American Industries, P.O. Box 684 Dept. C, Hollywood, Calif. 90028. Pat. Pend. Caution: This product not for human consumption. To be used as a room odorizer only. Inhalation may cause dizziness. Keep out of reach of children. 'Contains nitrites.'"

[4] It might be noted that section 4052 contains a general exception to section 4050 for certain packaged chemicals or drugs which are marketed under a patented trademark or trade name and comply with the Federal Food, Drug and Cosmetic Act and the pure food and drug laws of the State of California. Although there was evidence produced at trial that the labeling of "Locker Room" (fn. 3, *ante*) indicated that the product was in accordance with the requirements of section 4052, that section was inapplicable here since it does not cover the portion of section 4050 which is directed at the sale of poisons as distinguished from chemicals or drugs.

[5] The first sentence of section 4160 reads: "'Poison' means and includes the compositions of the following schedules: . . . ." Four schedules, entitled "A" through "D," then follow. Subsection (n) of schedule "B" reads: "Nitroglycerine and nitrites."

We note that some nitrite compounds may be excepted from the application of section 4050 in certain circumstances, such as when they are sold by a manufacturer or wholesaler

DISCUSSION

■ One of the cardinal rules of statutory interpretation is that statutes should, if their language permits, be construed so as to render them valid and constitutional rather than invalid and unconstitutional. (*People* v. *Amor* (1974) 12 Cal.3d 20, 30 [114 Cal.Rptr. 765, 523 P.2d 1173].) A statute is presumed to be valid and mere doubt is not sufficient to overcome the presumption. (*In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal.Rptr. 1, 450 P.2d 296]; see *Findley* v. *Justice Court* (1976) 62 Cal.App.3d 566, 570 [133 Cal.Rptr. 241].)

■ On the other hand, due process demands that those subject to a state's penal laws be sufficiently informed as to what is commanded or forbidden before they may be prosecuted thereunder; no one is to be required to speculate as to the meaning of a penal statute at peril of his or her life, liberty or property. (*Lanzetta* v. *New Jersey* (1939) 306 U.S. 451, 453 [83 L.Ed. 888, 890, 59 S.Ct. 618]; *Findley* v. *Justice Court, supra,* 62 Cal.App.3d 566, 570.) It is thus well established that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Construction Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; see also *Findley* v. *Justice Court, supra.*)

■ We conclude that section 4050, as interpreted in conjunction with section 4160, fails to attain the degree of certainty as to its application necessary to pass constitutional muster.

The question which initially arises in this regard is whether section 4050 was ever intended to be applied to butyl nitrite when it is used in a product like "Locker Room," or, in other words, when the use of the substance is devoid of any apparent medicinal or pharmaceutical purpose.

A negative answer to this initial question is, at first glance, suggested by an analysis of the statutory scheme of which sections 4050 and 4160 are

under adequate supervision to protect the public health (§ 4050.5; but see §§ 4060 and 4393), or when they are used as a dietary or food supplement in accordance with federal and state food and drug laws (§ 4057), or when they are employed for agricultural purposes (§ 4058). There would appear, however, to be no code section specifically excepting the sale of butyl nitrite from the application of section 4050 under circumstances like those presented here. (See also fn. 4, *ante.*)

part (see *People* v. *Navarro* (1972) 7 Cal.3d 248, 273 [102 Cal.Rptr. 137, 497 P.2d 481]). The two statutes are both found in chapter 9 of division 2 of the Business and Professions Code. Division 2 is entitled "Healing Arts," and is divided into various chapters which individually regulate the licensing and conduct of different health care providers, such as physicians, dentists, nurses, etc. Chapter 9 thereof is devoted to the regulation of the pharmacy profession. With no better guide as to the legislative intent behind the enactment of the statutes in question, we note that similar statutory language in the predecessor to chapter 9, the Pharmacy Act, was found to have the purpose of preventing "the sale of *drugs and medicines* by any person not a registered pharmacist or assistant pharmacist . . . ." (*People* v. *Arthur* (1934) 1 Cal.App.2d Supp. 768, 771 [32 P.2d 1002], italics added.) In view of the foregoing, it might be concluded that the Legislature did not intend by the enactment of sections 4050 and 4160 to restrict the sale of any poisons other than those with a medicinal or pharmaceutical application.

The above analysis, however, breaks down upon closer inspection of the statutory scheme. For while the other restricted items mentioned in section 4050, namely, drugs,[6] chemicals,[7] and prescribed medicines or devices,[8] are defined in the code with reference, either directly or indirectly, to an intended therapeutic purpose, the definition of poison contained in section 4160 is not, in general, similarly circumscribed.[9] Had the Legislature intended to limit the definition of poison in that section to substances with a medicinal or pharmaceutical purpose, it presumably

---

[6]Section 4031 provides: " 'Drug' means (1) articles recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement of any of them; (2) articles intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease in man or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; (4) articles intended for use as a component of any article specified in clause (1), (2), or (3)."

[7]Section 4045 provides: " 'Chemical' or 'chemicals' includes all chemicals intended for use in the cure, mitigation, treatment, or prevention of disease in man or other animals, but does not include chemicals used for any other purpose."

[8]Section 4036 reads in part: " 'Prescription' means an oral order given individually for the person for whom prescribed, directly from the prescriber to the furnisher, or indirectly by means of a written order, signed by the prescriber, and shall bear the name and address of the patient, the name and quantity of the drug or device prescribed, directions for use, and the date of issue, and either rubber stamped, typed, or printed by hand or typeset the name, address, and telephone number of the prescriber, his license classification, and his federal registry number, if a controlled substance is prescribed. . . ."

[9]One notable exception is the reference in section 4160 to methyl alcohol and formaldehyde, which are excluded from the definition of poison when they are "used as a preservative and not sold to the general public." (§ 4160, schedule "B," subd. (*1*).) No such similar exemption appears in section 4160 with respect to nitrites.

would have done so either expressly or by framing the definition in a manner which utilizes a recognized pharmaceutical product index.

Additional evidence that the Legislature did not intend to so limit the definition of poison in section 4160 is indicated by the express inclusion therein of the following products: "glue, cement, dope, paint thinners, paint [when they contain toluene], and any combination of hydrocarbons either alone or in combination with any substance or material including but not limited to paint, paint thinners, shellac thinners, and solvents which, when inhaled, ingested, or breathed, can cause a person to be under the influence of, or intoxicated from, any such combination of hydrocarbons." (§ 4160, sched. "D," subd. (a).)[10] We are unaware of any medicinal or pharmaceutical applications for products like paint or paint thinner.

Furthermore, the inclusion of items like paint and paint thinner in the definition of poison makes graphic the seeming absurdity of the statutory scheme before us. Pursuant to a literal reading of sections 4050 and 4160, only a registered pharmacist (or someone acting under the direction of one) may sell many of the supplies commonly required by a painter. In addition, section 4164 provides that "No poison enumerated in Schedules 'A,' 'B,' and 'D' in Section 4160, shall be sold or delivered to any person who is less than 18 years of age." Thus, if our painter were still a minor, he would be unable to obtain the painting supplies listed in schedule "D" of section 4160 from anyone, including a pharmacist.

Another example of such seeming absurdity lies in the unqualified inclusion in section 4160 of "larkspur." (§ 4160, sched. "B," subd. (p).) While the term "larkspur" may refer to certain seeds from which a tincture to be used against lice can be prepared, its primary definition refers to the plant of that name of the genus *Delphinium*. (Webster's Third New Internat. Dict. (1966 unabridged) p. 1273.) Again, taken literally, sections 4050 and 4160 would prohibit all but registered pharmacists from selling larkspur plants, even when they are to be used only for decorative purposes; section 4164 would prevent anyone under 18 years of age from ever lawfully obtaining such plants. These unreasonable results could not have been intended by the Legislature.

[10] Harmful glues or cements are excluded from the definition of poison in section 4160, however, if they either contain a substance which makes them malodorous or sneeze-inducing or are sold simultaneously with a kit used for the construction of model airplanes, boats, etc.

An additional difficulty with the statutory scheme before us results from the inclusion in section 4160 of the phrase " 'Poison' means and includes the *compositions* of the following schedules: . . ." (Italics added; see fn. 5, *ante.*) The word "composition" has several accepted meanings, among which are the following:

"[1] . . . the nature of a chemical compound or mixture as regards the kind and amounts of its constituents . . .

"[2] . . . the manner in which something is composed or compounded . . .

"[3] . . . an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients . . ." (Webster's Third New Internat. Dict., *supra,* p. 466.)

In view of these varied definitions, it is uncertain whether the Legislature intended the word "compositions" in section 4160 to refer only to the individual items mentioned in each subsection within the four schedules, or rather to mixtures composed entirely of items from several subsections or schedules, or instead to any mixture provided it contains one of the items listed in the schedules. The significance of this point is greater than at first might appear when it is remembered that the subject product, "Locker Room," contained but 12 to 16 percent butyl nitrite. While most of the substances mentioned in section 4160 are expressly described as also including "preparations" containing those substances (see, e.g., § 4160, sched. "A," subd. (a), which refers to "Arsenic compounds and preparations"), subdivision (n) of schedule "B" merely refers to "Nitroglycerine and nitrites." It can be argued that the Legislature's failure to explicitly state that "preparations" containing nitrites are to be included in the definition of poison is an indication that only nitrites in their pure form were intended to be within the statutory restriction and that products like "Locker Room," which are but part nitrite compound, were intended to be exempted.

As the foregoing demonstrates, the statutory scheme in question impermissibly leaves the people of this state to speculate at their peril as to the nature of the conduct prohibited. (*Lanzetta* v. *New Jersey, supra,*

306 U.S. 451, 453 [83 L.Ed. 888, 890]; see *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214, 231 [82 Cal.Rptr. 175, 461 P.2d 375].) Left without any firm indication of what the Legislature intended by this legislation, we have no choice but to hold section 4050 constitutionally invalid insofar as it relies on the definition of poison set forth in section 4160.

The judgment of conviction is reversed.

Allport, J., and Potter, J., concurred.