[No. A097480. First Dist., Div. Four. July 30, 2003.]

RICKY E. SHADDOX, Plaintiff and Appellant, v.
JEFFREY J. BERTANI, Defendant and Respondent.

**COUNSEL**

Law Offices of Edwin J. Zinman, James J. Davis III and Edwin J. Zinman for Plaintiff and Appellant.

Lewis Brisbois, Bisgaard & Smith and Daniel J. Meagher for Defendant and Respondent.

**OPINION**

**KAY, P. J.—** ■ The Confidentiality of Medical Information Act (Civ. Code,[1] § 56 et seq., hereafter CMIA) establishes the general principle that a patient's medical information shall not be disclosed by health care providers, subject to a number of mandatory and permissive exceptions. One of the enumerated permissive exceptions allows release of medical information "when the disclosure is otherwise specifically authorized by law" and uses, as an example, a voluntary report to the Food and Drug Administration. (§ 56.10, subd. (c)(14), hereafter subdivision (c)(14).) The issue presented here is whether a dentist treating a police officer who he suspects may have a problem with prescription drugs, can, without violating the CMIA, advise the officer's department of that suspicion.

We agree with the trial court that the dentist's communication with the officer's superiors was covered by subdivision (c)(14), and therefore not actionable. As will be explained, the dentist's communication is no different from the example used by the Legislature when it enacted subdivision (c)(14). We also agree with the trial court that a person enjoys absolute statutory immunity under section 47, subdivision (b)(3) for making a communication, which leads to an official investigation of a police officer's conduct

---

[1] Statutory references are to the Civil Code unless otherwise indicated.

or competence. By reason of these separate and independent grounds supporting the trial court's ruling, we will affirm the judgment in favor of the dentist.

## BACKGROUND

Plaintiff Ricky Shaddox is a San Francisco Police Officer. Defendant Jeffrey J. Bertani, D.D.S., is a member of a San Francisco dental clinic. The details of their encounter on April 24, 1998, are largely without dispute.

Officer Shaddox has been a member of the San Francisco Police Department (SFPD) since 1989. On the first day of 1997 he suffered a work-related injury to the right side of his face. Thereafter he experienced constant pain and frequent bleeding from his mouth, nose, and ears. Along with consulting numerous physicians, Shaddox went to a dentist who is in practice with Dr. Bertani. Eventually a wisdom tooth was removed. Following the extraction, Vicodin was prescribed.[2] Shaddox's dental records show that the Vicodin prescription was refilled at least once. The records also show a notation in September 1997 of "No more meds/ especially Vicodin*" and several refused requests for refills thereafter.

Prior to April 24, 1998, Dr. Bertani's sole contact with Officer Shaddox had been a telephoned prescription for antibiotics and a renewed Vicodin prescription for Shaddox (whom Bertani did not examine) in August of 1997. On the afternoon of April 24 Officer Shaddox was in uniform when he stopped at the clinic to make an appointment to see a dentist, but in plainclothes and off duty when he came in for the appointment at 4 p.m. Shaddox complained of severe pain, which "first occurred one month ago." The visit was brief, Dr. Bertani concluding that he "couldn't find any source of the pain" and that Shaddox merely needed his teeth cleaned. Shaddox then asked for "Vicodin-ES [Extra Strength]."[3] Dr. Bertani declined to prescribe this medication. While leaving the examination room, Officer Shaddox again asked for Vicodin and again was rebuffed. According to Dr. Bertani, upon hearing the second refusal, Shaddox "gave this icy glare as if he wanted to ... beat me up." Dental assistants who observed Shaddox described him as "psycho," and told Dr. Bertani "It looked like he wanted to kick your ass."[4]

---

[2] At least three physicians had prescribed Vicodin and other pain-killing medications for Officer Shaddox. Two of these physicians had declined to refill the prescriptions during the month of April; one of the refusals was on April 23. There is nothing in the record showing that Dr. Bertani knew any of this when he examined Officer Shaddox the following day.

[3] An internal SFPD memo describes Vicodin ES as composed of acetaminophen and Hydrocodone bitartrate, the latter "a semi-synthetic narcotic derived in part from opium," which is a schedule II controlled substance. (See Health & Saf. Code, § 11055, subd. (b)(1)(J).)

[4] Officer Shaddox's version differed only in that he never demanded Vicodin and never glared at Dr. Bertani.

Dr. Bertani believed he was confronting "a dangerous situation" because "here is a police officer obviously very upset that I didn't give him narcotics. That to me is a dangerous situation. Dangerous to him, to the general public, to my staff." As soon as he was back in his office, Dr. Bertani called the SFPD and spoke to Inspector Waterfield, who was another of Bertani's patients. Dr. Bertani advised Waterfield that "I had a police officer in the office who had requested narcotics and what should I do about that." Waterfield transferred Bertani's call to a sergeant in the internal affairs department. An internal police memo summarizes the ensuing conversation: "Dr. Bertani told Sergeant Corriea that Officer Ricky Shaddox was in his dental office presenting with a subjective complainant [sic] of severe pain. Bertani could not find any objective support for Shaddox's complaint. Shaddox was requesting a prescription [for] Vicodin. Bertani reviewed his files and noted that Officer Shaddox had come to his office on previous occasions requesting pain medication. In fact, there was a note in Bertani's file made by another dentist in the office in September of 1997 directing that Shaddox not receive any other pain medication. [¶] Dr. Bertani's concern that Officer Shaddox might be dependent on prescription pain medication prompted his phone call to Inspector Waterfield ...."

As a result of the ensuing internal investigation, Officer Shaddox was disciplined for "improper conduct" in not complying with SFPD General Order 2.03 ("Drug Use By Members"), specifically the directive that "Any member using legal over-the-counter non-prescription drugs, or prescription drugs, who feels in any way impaired shall advise his/her supervisor of such impairment."[5] At the time of trial three years later, Officer Shaddox was assigned to a desk job, not allowed to carry a firearm, and not allowed paid overtime. Shaddox believed the incident effectively ended any prospect of promotion.

Although during the SFPD's investigation Officer Shaddox professed relief and gratitude that his dependency was being addressed, he nevertheless filed a complaint for Dr. Bertani's alleged violation of the CMIA, invasion of privacy, intentional and negligent infliction of emotional distress. After a four-day bench trial, the court ruled that Dr. Bertani's actions were protected

---

[5] Notwithstanding the implication that notification is required only if the officer feels impaired, it appears that General Order 2.03 is construed to require notification whenever an SFPD officer is taking prescription drugs. A memo from the Chief of the SFPD during the investigation states: "If Officer Shaddox has been prescribed Vicodin ES or other scheduled medications which could affect his safe performance of patrol duties, the general orders require him to notify supervisors and provide information from the prescribing medical practitioner about the effect of the drug and its expected impact on the employee in performing assigned duties. [¶] ... If Officer Shaddox is using prescription drugs, he must comply with DGO 2.03 and inform supervisors what prescribed drug, if any, he is using and what impact it may have on his duties."

by subdivision (c)(14) and by subdivision (b). Shaddox perfected this timely appeal from that judgment.

## REVIEW

■ The CMIA is primarily concerned with the release of a patient's medical information by a "provider of health care," which is defined in part as "any person licensed or certified pursuant to Division 2 (commencing with Section 500 of the Business and Professions Code" (§ 56.05, subd. (i)). Dentists are one of the healing arts professions covered by Division 2. (See Bus. & Prof. Code, § 1600 et seq., esp. § 1626 [unlawful to practice dentistry unless licensed by Board of Dental Examiners]; *People v. Barben* (1979) 88 Cal.App.3d 215 [219, 151 Cal.Rptr. 717].) The definition of "provider of health care" in the CMIA is the same used in numerous other statutes (e.g., Bus. & Prof. Code, § 657, subd. (d); Civ. Code §§ 43.9, subd. (d)(1), 1714.8, subd. (b), 3333.1, subd. (c)(1), 3333.2, subd. (c)(1); Code Civ. Proc., §§ 340.5, 364, subd. (f)(1); Health & Saf. Code, § 120261, subd. (f)), none of which have ever been construed to exclude dentists.[6]

### SUBDIVISION (c)(14)

The CMIA was originally enacted in 1979 and since then has been repeatedly and extensively amended. "Section 56 was originally enacted ... 'to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information.' [Citation.]" (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 38 [32 Cal.Rptr.2d 200, 876 P.2d 999].) Section 56.10 has three essential parts. The first is subdivision (a), which states the general rule of confidentiality: "No provider of health care, health care service plan, or contractor shall disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization, except as provided in subdivision (b) or (c)." The second part of the statute is subdivision (b), which enumerates nine instances in which disclosure is mandatory ("shall disclose"). The final part is subdivision (c), which enumerates 17 types of situations where disclosure is permissive ("may disclose"). The 14th of these permissive exceptions to the general rule of nondisclosure is the one at issue here. It provides: "The information may be disclosed when the disclosure is otherwise specifically authorized by

---

[6] Officer Shaddox asserts that Dr. Bertani's call to the SFPD violated not only the CMIA, but also the physician-patient privilege codified in Evidence Code section 990 et seq. Determining whether a dentist is also subject to the physician-patient privilege as defined by the Evidence Code—a point never heretofore examined in a reported decision—would add nothing to our analysis of whether Dr. Bertani, as a provider of health care, is liable for violating the CMIA, the sole statutory basis of Shaddox's complaint.

law, such as the voluntary reporting, either directly or indirectly, to the federal Food and Drug Administration of adverse events related to drug products or medical device problems."

Subdivision (c)(14) was enacted in three stages. It started as subdivision (c)(13) and provided that medical information could be disclosed "When the disclosure is otherwise specifically authorized by law." (Stats. 1990, ch. 911, § 1, p. 3862). In 1994 this version was renumbered as subdivision (c)(14). (Stats. 1994, ch. 700, § 3, p. 3381.) It emerged with its current wording in 1999. (Stats. 1999, ch. 526, § 2.)[7] Nothing in the history of these three enactments sheds any light on the Legislature's intent or purpose. Subdivision (c)(14) has not yet been construed in any reported decision.

The federal government has a long-standing policy of encouraging—and in some cases requiring—the reporting of harmful events and consequences resulting from the use of drugs and other products licensed by the Food and Drug Administration (FDA). (See 21 U.S.C. § 355b(a) [establishing toll-free number for "receiving reports of adverse events regarding drugs"]; § 360i(b)(1)(A) & (b)(1)(B) [requiring reports of adverse information about devices "intended for human use"]; 21 C.F.R. § 310.305 (2003) [drug manufacturers and distributors required to maintain records and report "all serious, unexpected adverse drug experiences associated with the use of their drug products"]; § 312.33(b)(4) [application for new drug approval to list persons who dropped out of test trials due to "any adverse experience, whether or not thought to be drug related"]; § 314.80(b) [each marketer of FDA-approved drugs to maintain and report adverse drug experiences]; § 314.98 [manufacturer to provide reports of "adverse drug experiences" from drugs being sold]; §§ 606.170–606.171 [requiring records of adverse reactions to blood & blood products]; § 803.32 [specifying contents of "adverse event report data" required of medical device manufacturers]); § 7.46(d) [voluntary recall because of "complaints or adverse reactions"]; § 71.15 [adverse reaction reports re color additives]; § 99.201(a)(2) [manufacturer to maintain clinical trial information including "adverse event reports"]; § 99.501(b)(3) [same]; § 211.198 [pharmaceutical manufacturer shall maintain complaint file].)

California has a policy of encouraging reports concerning suspected misconduct or unfitness by law enforcement officers. As noted by the trial court, one example of this policy is codified in San Francisco's basic law: "The

---

[7] The same bill augmented the criminal penalty for violating the CMIA with administrative fines and civil penalties for negligent and intentional disclosures of confidential medical information; the fines and civil penalties could be awarded in actions commenced in the name of the People by specified state, county, or city law enforcement officials. (§ 56.36, as amended by Stats. 1999, ch. 526, § 8.)

Charter of the City and County of San Francisco establishes a strong public policy of encouraging citizens to report claims of misconduct by police officers and vests in the Police Commission and the Chief of Police authority to impose, after a fair and public hearing, discipline on police officers when misconduct has been proven to have occurred."[8] There is also a state statute directing that "Each department or agency in this state that employs peace officers shall establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies...." (Pen. Code, § 832.5, subd. (a)(1).)[9] Officer Shaddox contends that the charter provisions cited by the trial court do not satisfy subdivision (c)(14) because they do not "mention[] medical information in any context, much less mention[] or discuss[] *specific authorization* for a health care provider's disclosure of medical information." The charter provisions "do not authorize—either specifically or impliedly—the disclosure of a police officer's (or any other person's) ... confidential medical information ... to the SFPD." Officer Shaddox appears to argue that a statute can only satisfy the "specifically authorized by law" language if it states in so many words that a health care provider is authorized to disclose, or shall not be liable for disclosing, medical information either for a specific purpose or to a specific recipient. We disagree.

◼ Statutes are to receive " ' ... a reasonable and commonsense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which ... will result in wise policy rather than mischief or absurdity.... ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744 [110 Cal.Rptr.2d 828, 28 P.3d 876].) Accepting the logic of Officer Shaddox's argument would not comply with these principles. It is not reasonable to expect municipal legislation to establish exceptions to statutes with statewide application. Conversely, commonsense would dictate against requiring the Legislature to anticipate and enumerate all possible applications of other statutes or legal principles in every bill it enacts. "[M]ost statutes must deal with untold and unforeseen variations in factual situations, and the

---

[8] The charter provisions cited by the trial court deal with governance of the SFPD. One provision states in pertinent part: "Complaints of police misconduct or allegations that a member of the Police Department has not properly performed a duty shall be ... investigated by ... the Office of Citizen Complaints. The Office of Citizen Complaints shall investigate all complaints of police misconduct, or that a member of the Police Department has not properly performed a duty, except those complaints which on their face clearly indicate that the acts complained of were proper and those complaints lodged by other members of the Police Department. ... [¶] Nothing herein shall prohibit the Chief of Police or a commanding officer from investigating the conduct of a member of the department under his or her command, or taking disciplinary or corrective action ... when such is warranted." (S.F. Charter, § 4.127.) The other provision specifies the procedures for "Fine, Suspension and Dismissal In Police and Fire Departments." (S.F. Charter, § A8.343.)

[9] This statute does not preempt the San Francisco Charter provisions. (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1209–1210 [36 Cal.Rptr.2d 55, 884 P.2d 1003].)

practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out" instances of a statute's intended application. (*Boyce Motor Lines, Inc. v. United States* (1952) 342 U.S. 337, 340 [96 L.Ed. 367, 72 S.Ct. 329].) As this Court recently stated: "To require that amount of detail would be inconsistent with the principle that legislation does not have to possess the exactness of mathematical formulae." (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 143 [122 Cal.Rptr.2d 425].)

Shaddox pins his whole argument on the word "specifically." His emphasis on that single word is overly narrow. ■ Our function is not to examine words in isolation, but to consider all of the statutory language and construe that language as a unified whole. (E.g., *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1040 [130 Cal.Rptr.2d 672, 63 P.3d 228]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) Using this approach, it is apparent that Shaddox does not pay sufficient heed to the "such as" language in subdivision (c)(14). "The phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated." (E.g., *Donovan v. Anheuser-Busch, Inc.* (8th Cir. 1981) 666 F.2d 315, 327.) The phrase is used in an illustrative, not an exhaustive sense. (*Abbott v. Bragdon* (D. Me. 1995) 912 F.Supp. 580, 586; *Abenante v. Fulflex, Inc.* (D. R.I. 1988) 701 F.Supp. 296, 301.) Subdivision (c)(14) thus serves as the residuary clause in section 56.10. It legitimizes a myriad of situations the Legislature may not have cared to spell out, by establishing the principle of permissive disclosure when specifically authorized by law. Not every piece of legislation, not every regulation, has to be a laundry list of all possible applications. Similarly, the charter provisions, and Penal Code section 832.5, are not excluded from the reach of subdivision (c)(14) because they do not address every means and type of communication that may be used to frame complaints against SFPD officers, or because they neglect to specify limitations on complaints from specific professionals.

The charter provisions establish procedures for acting upon complaints of misconduct and thereby maintaining public confidence in the professionalism of the SFPD police officers. A procedure for investigating "complaints of police misconduct or allegations that a member of the Police Department has not properly performed a duty ... except those complaints ... lodged by other members of the Police Department" (S.F. Charter, § 4.127, quoted at fn. 8, *ante*), clearly accepts that complaints will come from outside the SFPD, i.e., the public.[10] As is the case with complaints from the public to the FDA about

---

[10] There is also the state law mandating that every law enforcement agency "establish a procedure to investigate complaints *by members of the public*" (Pen. Code, § 832.5, subd. (a)(1), italics added).

adverse reactions, complaints to law enforcement agencies are voluntary. That fact supplies no basis to distinguish complaints to law enforcement agencies from those made to the FDA, the very example of the kind of disclosures permitted by the legislature in subdivision (c)(14).[11]

### Section 47, Subdivision (b)(3)

As previously noted, the charter provisions cited by the trial court, and Penal Code section 832.5, establish that California has a policy of encouraging reports concerning suspected misconduct or unfitness by law enforcement officers. This policy is so strong that virtually no complaint, no matter how ill founded or basely motivated, has yet been found sufficient for either criminal (see *People v. Stanistreet* (2002) 29 Cal.4th 497, 502 [127 Cal.Rptr.2d 633, 58 P.3d 465]; *Pena v. Municipal Court* (1979) 96 Cal.App.3d 77, 82–83 [157 Cal.Rptr. 584]; *People v. Craig* (1993) 21 Cal.App.4th Supp. 1 [26 Cal.Rptr.2d 184]; 79 Ops.Cal.Atty.Gen. 163 (1996)) or civil liability. (*Imig v. Ferrar* (1977) 70 Cal.App.3d 48, 55–56 [138 Cal.Rptr. 540].)

Complaints are regarded as privileged by section 47, subdivision (b)(3), which provides in pertinent part: "A privileged publication or broadcast is one made: [¶] ... (b) ... (3) in any other official proceeding authorized by law...." ■ Complaints or communications regarding an officer's fitness or performance of duty are firmly established as being within this privilege. "[I]nvestigation of a citizen's complaint against a law enforcement officer is an official proceeding authorized by law. (See Pen. Code, § 832.5, subd. (a).) A communication to an official agency which is designed to prompt action is considered a part of an official proceeding for purposes of [] section 47." (*Walker v. Kiousis* (2001) 93 Cal.App.4th 1432, 1439 [114 Cal.Rptr.2d 69]; see *Hunsucker v. Sunnyvale Hilton Inn* (1994) 23 Cal.App.4th 1498, 1502–1503 [28 Cal.Rptr.2d 722] and decisions cited; *Imig v. Ferrar, supra,* 70 Cal.App.3d 48, 54–55.)[12] The purpose behind the policy is " 'to assure utmost freedom of communications between citizens and public authorities

---

[11] It bears repeating that the example used in subdivision (c)(14) is the "*voluntary* reporting" (italics added) to the FDA. If reports to governmental agencies were not voluntary but made pursuant to a statute or regulation, they would come under the mandatory provision of section 56.10, subdivision (b)(9), governing disclosures "otherwise specifically *required* by law." (Italics added.)

[12] The sole exceptions to this immunity appear to be for defamation or malicious prosecution. (See § 47.5; *People v. Stanistreet, supra,* 29 Cal.4th 504, 512; *Walker v. Kiousis, supra,* at p. 1440–1441.) *Fenelon v. Superior Court* (1990) 223 Cal.App.3d 1476 [73 Cal.Rptr. 1476] held that a knowingly false report to police was entitled to only a qualified privilege. This conclusion has not been accepted by other courts (see *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926–927 [120 Cal.Rptr.2d 576]; *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 494–496 [100 Cal.Rptr.2d 905]) and this court has declined to follow it. (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1051 [61 Cal.Rptr.2d 58].) The Court of Appeal which decided *Fenelon* recently repudiated it. (*Navarette v. Holland* (2003) 109 Cal.App.4th 13, 16, 18–21 [134 Cal.Rptr.2d 403].)

whose responsibility is to investigate and remedy wrongdoing ....' " (*Pena v. Municipal Court, supra,* 96 Cal.App.3d 77, 82, quoting *Imig v. Ferrar, supra,* at p. 55), thereby freeing citizens from the threat of litigation. (*Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 [100 Cal.Rptr.2d 437].) "The importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity outweighs the occasional harm that might befall a defamed individual. Thus the absolute privilege is essential." (*King v. Borges* (1972) 28 Cal.App.3d 27, 34 [104 Cal.Rptr. 414].) Given the importance of the public policy it promotes, the privilege is interpreted broadly to protect communications preceding the initiation of formal proceedings. (*Slaughter v. Friedman* (1982) 32 Cal.3d 149, 156 [185 Cal.Rptr. 244, 649 P.2d 886].)

Shaddox argues that the privilege should be limited to situations where a citizen reports suspected misconduct or wrongdoing while an officer is on duty and performing official duties. It should not apply here, he submits, because he "was off-duty, unarmed, and in civilian dress when he consulted Bertani in a private dental appointment" and "not in Bertani's dental office on official police business." We believe the distinction Shaddox suggests is contrary to sound public policy. There is nothing to recommend limiting the privilege to reports of an officer's misconduct only when committed during official hours of employment.

"Police officers occupy a unique position of trust in our society. They are responsible for enforcing the law and protecting society from criminal acts. They are given the authority to detain and to arrest and, when necessary, to use deadly force"; this authority ultimately rests upon "the community's confidence in the integrity of its police force." (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 206–207 [285 Cal.Rptr. 99, 814 P.2d 1341].)[13] To protect that confidence, an officer is judged as much by private conduct as by on-duty performance. (E.g., *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 571–572 [273 Cal.Rptr. 584, 797 P.2d 608]; *Cranston v. City of Richmond* (1985) 40 Cal.3d 755, 770, fn. 13 [221 Cal.Rptr. 779, 710 P.2d 845].) That a person's unfitness for law enforcement

---

[13] The same point is made in the SFPD's General Order 2.03: "Police officers hold a trust from the public. As part of that trust, police officers are empowered to use lethal force without recourse to other than their immediate judgment. This power demands that those who hold it should *at all times* be in complete physical and mental control. Furthermore, police officers are empowered to deprive other citizens of their freedom when they violate the law. Because they have this power, the public expects, and rightly so, that police officers live up to the highest standards of conduct they enforce among the public generally." The portion of the text we have italicized makes the same point emphasized elsewhere in the order, that the policy applies "at any time, whether on or off duty ...."

can clearly be found in off-duty behavior has become an established incident of public employment. (E.g., *Cranston v. City of Richmond, supra,* [officer discharged for off-duty reckless driving]; *Cleu v. Board of Police Commissioners* (1906) 3 Cal.App. 174, 176 [84 P. 672] [officer dismissed for failing to pay debts].) The occasional unfounded calumny is accepted as a price for public confidence in the institution. (E.g., *Pena v. Municipal Court, supra,* 96 Cal.App.3d 77, 82; *Imig v. Ferrar, supra,* 70 Cal.App.3d 48, 56.)

Dr. Bertani was concerned with the possibility that a member of the SFPD either was, or was at risk of becoming, dependent upon prescription drugs. General Order 2.03 establishes that the SFPD is sufficiently concerned with its officers becoming drug dependent that it has made the issue a matter of internal discipline. It is entirely foreseeable that the SFPD would receive and investigate civilian reports that officers were not capable of performing their important public duties. Dr. Bertani was alerting the SFPD about one of its officers possibly having a problem that could impair his ability to perform the vital public safety responsibilities entrusted to a metropolitan law enforcement agency. Dr. Bertani did not reveal the particulars behind his concern, or even identify Officer Shaddox as the focus of that concern, until he was speaking with the "appropriate authority in the police department." (*Imig v. Ferrar, supra,* 70 Cal.App.3d 48, 56–57.) The subsequent investigation by the SFPD demonstrated that Dr. Bertani's apprehensions were not fanciful. That investigation was, as recognized by the trial court, implicitly authorized by the charter provision quoted above, and by Penal Code section 832.5. Dr. Bertani's communication thus qualifies as one made in the course of an "official proceeding authorized by law" and was consequently privileged by section 47, subdivision (b)(3). (*Slaughter v. Friedman, supra,* 32 Cal.3d 149, 156; *Walker v. Kiousis, supra,* 93 Cal.App.4th 1432, 1439.)

CONCLUSION

The controversy between Officer Shaddox and Dr. Bertani lies at the intersection of a number of weighty and conflicting concerns of the deepest public policy. Concerns about medical privacy are if anything increasing at hyper speed in the cyber age, prompting protective legislation and a myriad of judicial decisions treating the disclosure of personal medical information as a compensable wrong. (E.g., § 1798 et seq. [Information Practices Act of 1977 regulating collection, use, and disclosure of personal information by governmental agencies]; Health & Saf. Code, § 120980 [limiting disclosure of HIV test results]; 45 C.F.R. §§ 160, 164 (2003) [regulations effective Apr. 14, 2003, setting privacy standards for medical records maintained by health plans and health care providers; regulations required by Health Insurance Portability and Accountability Act of 1996, Pub.L. No. 104–191, 110 Stat. 1936]; Annot., Physician's Tort Liability for Unauthorized Disclosure of

Confidential Information About Patient (1986) 48 A.L.R.4th 668; *id.* (2002 Supp.) 26 [collecting decisions]; Gostin, *Health Information Privacy* (1995) 80 Cornell L. Rev. 451; Note, *Breach of Confidence: An Emerging Tort* (1982) 82 Colum. L. Rev. 1426.) This undoubted desire for an individual's medical confidentiality confronts the profound needs of public safety. Nevertheless, many of the courts, which have recognized a cause of action for wrongful disclosure of medical information, have done so with the proviso that issues of public safety may be paramount to personal privacy. (E.g., *Horne v. Patton* (1974) 291 Ala. 701 [287 So.2d 824, 827–828]; *Bratt v. Intern. Business Machines Corp.* (1984) 392 Mass. 508 [467 N.E.2d 126, 137]; *Biddle v. Warren Gen. Hosp.* (1999) 86 OhioSt.3d 395 [1999 Ohio 115, 715 N.E.2d 518, 524]; *Bryson v. Tillinghast* (Okla. 1988) 1988 OK 6 [749 P.2d 110, 113]; *Simonsen v. Swenson* (1920) 104 Neb. 224 [177 N.W. 831, 832]; *Hague v. Williams* (1962) 37 N.J. 328 [181 A.2d 345, 349].) In California the public safety principle is the basis for the celebrated decision of *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334], wherein our Supreme Court considered whether a psychotherapist who knows of a patient's homicidal intentions toward a third party is, notwithstanding the normal obligations of medical confidentiality, under a duty to warn that party of potential danger from the patient. The court concluded that "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. *The protective privilege ends where the public peril begins.*" (*Id.* at p. 442, italics added.)

Dr. Bertani did what he did because he believed Officer Shaddox posed a danger to himself and to the public. The trial court found that Dr. Bertani "had a strong and reasonable basis" for his concern. Only Dr. Bertani possessed the information leading him to suspect the officer's fitness for duty. Dr. Bertani disclosed his concern to the appropriate department of the SFPD, and no one else. Apart from its source, the disclosure was the type of report of suspected misconduct or unfitness of a police officer sanctioned by the San Francisco Charter, by Penal Code section 832.5, and by section 47, subdivision (b)(3). We believe it is sound public policy to construe subdivision (c)(14) in a way that will not impede voluntary reports of suspected misconduct or unfitness by police, reports whose importance is already recognized and immunized by section 47, subdivision (b)(3). (See *Renee J. v. Superior Court, supra*, 26 Cal.4th 735, 744.) This construction will protect the public interest by reducing danger to the public. (See *Tarasoff v. Regents of University of California, supra*, 17 Cal.3d 425, 442.) We therefore agree with the trial court that Dr. Bertani's disclosure was not only lawful under subdivision (c)(14), it was also privileged by section 47, subdivision (b)(3).

The judgment is affirmed.

Sepulveda, J., and Rivera, J., concurred.

A petition for a rehearing was denied August 29, 2003.