Filed 11/22/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MICHAEL McNAIR,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>        Defendants and Respondents. | A138952<br><br>(City & County of San Francisco Super. Ct. No. CGC-09-489734) |

This action arises out of a letter written by Dr. Ann Kim disclosing her patient Michael McNair's confidential medical history and health conditions. Dr. Kim sent the letter to the California Department of Motor Vehicles ("DMV") against McNair's wishes due to public safety concerns. As a result, McNair's commercial driver's license was temporarily revoked, and he lost his job as a bus driver. After McNair filed suit alleging injury due to breach of his medical privacy rights, the trial court granted summary adjudication on his intentional tort cause of action and nonsuit on his breach of contract claim. Specifically, the trial court determined that McNair's intentional tort claim was barred by the litigation privilege, Civil Code section 47, subdivision (b) (section 47(b)).[1] Thereafter, the court granted nonsuit on McNair's breach of contract cause of action on a host of different grounds, including the litigation privilege. On appeal, McNair asks us to determine whether the trial court erred: (1) in concluding that the litigation privilege barred his intentional tort claim; (2) in granting nonsuit; and (3) in granting certain pre-trial motions prior to the jury trial on his breach of contract claim. Because we conclude that both of McNair's claims were barred by the litigation privilege, we affirm.

---

[1] All statutory references are to the Civil Code unless otherwise indicated.

1

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. *Factual Background*

Michael McNair obtained a commercial driver's license in 2000 and began driving approximately 25 to 30 weeks per year. McNair has a history of diabetes and cognitive deficits. Dr. Ann Kim, a staff physician and primary care internist employed by the San Francisco Department of Public Health (DPH), treated McNair from 2004 to 2006 at the Maxine Hall Health Center (MHHC). In 1996, 1997, and 2003—while under the care of other DPH physicians—McNair signed three documents generated by the DPH entitled "Consent General Health Care" (Consents). The Consents all stated that his medical records would not be released without his written authorization, absent an articulated exception to this general rule. One such exception was situations in which the DPH was "permitted or required by law" to release the information.

In 2002, McNair saw Dr. Pope for an examination to determine whether he qualified for Social Security Insurance (SSI). McNair told Dr. Pope about his prior employment and driving history. Specifically, he reported that, in the past, he had followed his own bus routes rather than those designated by his employer and was unwilling to assist passengers and follow procedures. McNair also stated that he did not like to babysit people. Further, McNair told Dr. Pope that, during one particular instance, he improperly drove a group of children from San Diego, California to Tijuana, Mexico. McNair stated he made a mistake and "just didn't think." After his examination of McNair, Dr. Pope concluded: "Frankly, given the problems described above, I would advise serious caution in recommending that the patient's professional driving license be renewed. At present, because of his cognitive deficits, impulsivity, and poor judgment and insight, I found Mr. McNair to be unable to seek or maintain even basic employment."

In December 2004, McNair asked Dr. Kim to determine his medical eligibility for a commercial driver's license with the DMV. Dr. Kim refused to certify him due to his cognitive disorder and uncontrolled diabetes. McNair then requested that other doctors at the MHHC certify him for his commercial driver's license, but the MHHC medical

2

director at the time stated that none of the other physicians would agree to certify him. Prior to this, from 2000 to 2004, McNair had had other doctors at the MHHC sign off on his medical certification for his commercial driver's license. He also had doctors at other hospitals such as Bay Medical, Concentra, and Potrero Hill City health clinic approve his medical certification.

The medical examination report submitted to the DMV required McNair to certify under penalty of perjury that he had provided true and correct information concerning his health. It stated that any false information could invalidate his medical examiner's certificate. However, in the medical examination report McNair provided to the DMV in 2004, McNair did not disclose that Dr. Pope had diagnosed him with reading, personality, and cognitive disorders. McNair claimed that he talked to his doctor about it and didn't think that he needed to disclose the information.

In 2005, the Homeless Advocacy Project arranged for McNair to see Dr. Joanne Keaney, Ph.D. in order for the doctor to determine if McNair would qualify for SSI benefits. Later that year, Dr. Kim asked to see Dr. Keaney's report because she was also trying to help McNair qualify for SSI benefits and believed her report would help him. On June 1, 2005, Dr. Kim wrote a letter to support McNair's application for SSI disability benefits and stated, in her opinion, that he was not able to hold down any type of full-time employment. Dr. Kim understood that the Social Security Administration wanted to know a doctor's opinion regarding whether the patient could work. If the patient could work, no benefits would be awarded. Dr. Kim believed that McNair's SSI application was eventually granted.

Thereafter, on April 20, 2006, Alameda County Transit ("AC Transit") hired McNair as a bus operator. McNair began a ten-week training program on April 25, 2006, and began driving regular bus routes on July 31, 2006. He told Dr. Kim about his new full-time job driving for AC Transit on August 29, 2006.

On October 18, 2006, Dr. Kim learned from a nurse that McNair needed a doctor's note sent to the DMV explaining his absence from a DMV hearing. The hearing dealt with McNair's application for a School Pupils Activity Bus (SPAB) certificate to drive

3

school busses. Dr. Kim did not write a letter of absence for him because, according to her records, McNair was not at the doctor's office on the day of the hearing. She did, however, call McNair on October 18 and tell him that he should not be driving children on a bus due to his poor health. Dr. Kim also told McNair that if she were to write anything to the DMV, then she would have to write about McNair's health conditions. McNair stated that he did not want Dr. Kim to communicate with the DMV.

Nevertheless, later that day, Dr. Kim wrote a letter to the DMV concerning McNair's diagnosis of Cognitive Disorder NOS. As stated above, McNair did not give permission to Dr. Kim to send this letter. The letter stated:

> "I am Mr. Michael McNair's primary care physician at Maxine Hall Health Center. It has recently come to my attention that Mr. McNair has been approved for a commercial driver's license. I did not sign off on his medical evaluation forms.
>
> "While I do not know of an occasion in which Mr. McNair suffered a lapse of consciousness, I believe it is in the interest of public safety that the DMV is aware that he has been diagnosed with Cognitive Disorder NOS. A neuropsychiatric assessment from May, 2005 performed by Joanne Keaney, PhD was done as a follow-up from a prior neuropsychiatric evaluation. Her assessment was that Mr. McNair is functionally illiterate, lacks the capacity to set limits on himself and fails to understand the consequences of his behavior. She thought his primary difficulty remaining employed appears not [sic] be the result of mild congenital or developmental brain damage that has not only affected his cognitive skills but more importantly has impaired his judgment, impulse control, insight, forethought and ability to introspect.
>
> "Dr. Pope's initial neuropsychiatric evaluation from 2002 states that he would advise serious caution in recommending that his professional driving license be renewed. He found Mr. McNair to also suffer from a personality disorder with limited insight, impulsiveness, and poor judgment."

Dr. Kim wrote the letter out of concern for McNair's safety and the safety of the public. She based her statements in the letter to the DMV on her own observations made while treating McNair at the MHHC and on the specialists' reports written by Drs. Pope

4

and Keaney. Dr. Kim learned from Dr. Pope's report that McNair had been fired in the past for his unwillingness to assist passengers. Dr. Pope's report also detailed the incident where McNair drove a bus over the Mexican border with children on board. Dr. Kim thought these past events were relevant to his ability to drive a school bus. In his report, Dr. Pope made a recommendation that McNair should not have a license to drive commercial vehicles. Dr. Keaney's report echoed Dr. Pope's opinions regarding McNair's vocational history and his ability to drive. Dr. Kim did not think, however, that either Dr. Pope or Dr. Keaney made any report to the DMV concerning McNair.

As stated above, Dr. Kim first became aware that McNair was working for AC Transit in August 2006. She did not send the letter to the DMV until October 2006 because she was wrestling with the decision whether to protect her patient's confidentiality or to disclose McNair's information for the safety of the public. But, once it came down to driving a school bus, that "just kind of pushed the balance." Even though McNair did not want Dr. Kim to send the letter disclosing his mental condition, she "felt obligated to let the DMV know that there was more information that they didn't have." Dr. Kim wanted the DMV "to have the medical information so that they could do their own assessment" in regard to McNair's ability to drive. Dr. Kim visited the DMV website before she sent the letter to review her reporting obligations.[2]

The DMV revoked McNair's driver's license on October 23, 2006, but McNair did not learn of the revocation until December 6, 2006, when his supervisor at AC Transit told him. Consequently, McNair stopped driving for AC Transit that day. It was also on that same date that McNair first saw Dr. Kim's letter. McNair's continued employment at AC Transit was contingent on getting his commercial driver's license reinstated by

---

[2] The record contains an excerpt from the DMV website which states, among other things, that the agency finds out about persons who may be unsafe to drive "from many sources, including law enforcement, physicians and surgeons, judges, family members and acquaintances." The website also contains the following directive: "Physicians are required by law (Health & Safety Code Section 103900) to report disorders characterized by lapses of consciousness, as well as Alzheimer's disease and related disorders. Additionally, they may report any other condition if they believe it would affect the driver's ability to drive safely."

January 17, 2007. McNair had two hearings at the DMV on December 15, 2006, and January 22, 2007, regarding the restoration of his license. After the first hearing, McNair had his regular driver's license restored. After the second hearing on January 22, he had his commercial driver's license reinstated. However, this was five days after the deadline that had been imposed by AC Transit, and McNair therefore lost his job. McNair tried to get his job back through the union, but lost in arbitration in January 2009.

**B.      *Procedural Background***

On June 23, 2009, McNair filed a complaint in San Francisco County Superior Court (Complaint), alleging causes of action for intentional tort and breach of contract against the City and County of San Francisco and Dr. Kim (collectively, City), based on Dr. Kim's disclosure of McNair's confidential information to the DMV. The intentional tort cause of action expressly stated that the disclosure of McNair's medical information violated the California Confidentiality of Medical Information Act (CMIA), Civil Code, section 52 et seq. With respect to the breach of contract claim, the Complaint stated that the contract at issue was "[p]artly written, partly oral and partly implied" as further described in the pleading. Attached to the Complaint were copies of several privacy notices that were routinely provided to patients by DPH: A DPH Notice of HIPPA Privacy Practices (HIPPA Privacy Notice) issued pursuant to the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d et seq. (HIPPA); and a related Summary DPH Notice of HIPPA Privacy Practices (DPH Summary Notice). Pursuant to the HIPPA Privacy Notice and the DPH Summary Notice, a patient's confidential health information was generally kept private, but could be shared when required by federal, state, or local law. In addition, the notices also provided: "Health information about you may be used and shared to law enforcement officials, mobile crisis team, or to an intended victim when necessary to prevent a serious threat to your health and safety or the health and safety of the public or another person. Any disclosure, however, would only be to someone able to help prevent the threat."

In November 2011, the City moved for summary judgment or, in the alternative, summary adjudication. After hearing, by order dated May 8, 2012, the trial court denied

6

the City's motion for summary judgment and its motion for summary adjudication as to McNair's breach of contract cause of action. However, the trial court granted the City's motion for summary adjudication of McNair's intentional tort cause of action. Specifically, the order stated: "The intentional tort cause of action fails based on the litigation privilege. [Citations.] HIPAA does not preempt the litigation privilege. The purpose of HIPAA is to protect medical confidences, not provide a cause of action."

Before trial on the breach of contract cause of action, the trial court resolved numerous motions in limine filed by both the City and McNair. Thereafter, upon the close of McNair's evidence, the City moved for nonsuit. The court ultimately granted nonsuit on a myriad of grounds, including: (1) that the litigation privilege applied to a contract cause of action premised on Dr. Kim's letter; (2) that McNair failed to present evidence that the City intended to enter into a contract with him; (3) that McNair did not present evidence that the contract was approved as to form by the City Attorney's office; (4) that McNair did not present evidence of breach of contract because Dr. Kim was permitted to report someone to the DMV who she believed was a danger to the public; (5) that McNair did not present evidence that any damages were foreseeable at the time of contract formation because he was not employed by AC Transit at that time; and (6) that McNair did not present any evidence of consideration for the contract.

The trial court entered judgment in favor of the City on April 12, 2013, with notice of entry on April 18. McNair's timely notice of appeal now brings the matter before this court.

## II. DISCUSSION

### A.    *Summary Adjudication on the Intentional Tort Cause of Action*

#### 1.    *Standard of Review*

The trial court granted the City's motion for summary adjudication of McNair's intentional tort cause of action. "A defendant moving for summary judgment has the burden of producing evidence showing that one or more elements of the plaintiff's cause of action cannot be established, or that there is a complete defense to that cause of action." (*Garcia v. W & W Community Development, Inc.* (2010) 186 Cal.App.4th 1038, 1041.) On appeal, we review an order granting summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860; *In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 150-151.) Moreover, "we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438.)

#### 2.    *The Litigation Privilege*

"The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 (*Silberg*).) The litigation privilege is "not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.) It is applied broadly,

8

and doubts are resolved in favor of the privilege. (*Wang v. Heck* (2012) 203 Cal.App.4th 677, 684 (*Wang*); *Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 500.)

The purpose of the litigation privilege is to afford litigants and witnesses freedom of access to the courts without the fear of harassment by subsequent derivative tort actions. (*Silberg*, *supra*, 50 Cal.3d at 213.) The privilege also " 'exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing.' " (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 958.) Thus, the phrase, " 'judicial or quasi-judicial proceedings,' " has been " 'defined broadly to include " 'all kinds of truth-seeking proceedings,' " including administrative, legislative and other official proceedings.' " (*Wang*, *supra*, 203 Cal.App.4th at 684.) As is relevant here, the DMV, as an administrative body of the state, has been recognized as engaging in quasi-judicial proceedings for purposes of the privilege. (*Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 (*Wise*).)

Application of this analytical framework to the present case leads us easily to the conclusion that the litigation privilege bars McNair's cause of action for intentional tort. Under *Silberg*, Dr. Kim's letter to the DMV was a communication made in a "quasi-judicial proceeding." (See *Wise*, *supra*, 83 Cal.App.4th at p. 1303.) Further, Dr. Kim was an individual "authorized by law"[3] to communicate to the DMV regarding McNair's

---

[3] Any argument that Dr. Kim's disclosure was not "authorized by law" because it violated confidentiality statutes is foreclosed by *Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948 (*Jacob B.*). In that case, the plaintiff argued that "because the letter broke confidentiality laws, it was not permitted by law and [writer of the letter] was not authorized by law to communicate the information to the court." (*Id.* at 958.) In clarifying the " 'permitted by law' " and "authorized by law" language, the court wrote: "It should be apparent that in *Albertson*, by using the term 'permitted by law,' we meant to *broaden* the privilege's reach beyond traditional limits by including any *category* of publication permitted by law. We did not suggest that the *specific* publication must be permitted." (*Id.* at p. 958-959.) Under *Jacob B.,* "such a communication is privileged even if a specific communication might not be permitted by law because, for example, it was either perjurious or meant to be kept confidential. Just as the privilege extends to communications otherwise within section 47(b)'s reach that are perjurious, it also extends

9

ability to drive. In addition, Dr. Kim wrote to the DMV "to achieve the objects of the litigation" because she sent the letter so that the DMV could evaluate McNair's ability to drive based on all relevant information. And, the letter had "some connection or logical relation to the action" because it actually prompted the subsequent DMV hearings regarding McNair's driving capabilities. (*Silberg*, *supra*, 50 Cal.3d at p. 212.) Thus, all four requirements for the litigation privilege laid out in *Silberg* are satisfied under the present facts.

Moreover, our conclusion in this case is buttressed by reference to relevant precedent. In *Wise*, *supra*, 83 Cal.App.4th 1296, for example, the court held that a husband's voluntary report to the DMV regarding his wife's drug usage and its impact on her ability to operate a motor vehicle fell within the litigation privilege. (*Wise*, *supra*, 83 Cal.App.4th at p. 1303.) The court rejected the wife's argument that her statutory and constitutional right to privacy must prevail over the litigation privilege because "the privilege is absolute and precludes recovery on all tort theories, *including* claims for invasion of privacy." (*Id*. at p. 1302-1303.) As the *Wise* court reiterated: "An absolute privilege exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing." (*Id*. at p. 1303.) Thus, the husband's statements to the DMV were covered by the privilege for quasi-judicial proceedings. (*Ibid*.) Similarly, here, because Dr. Kim's letter to the DMV questioning McNair's driving safety was a "statement [ ] made to initiate official action," the absolute privilege applies. (See *ibid*.)

Additionally, in *Wang*, *supra*, 203 Cal.App.4th 677, two individuals were critically injured after being struck by a car driven by an individual who suffered an

---

to communications otherwise within its reach that might be deemed confidential." (*Id*. at p. 959.) Here, Dr. Kim disclosed McNair's confidential medical information to the DMV. As stated above, both the DMV and state law clearly contemplate, encourage, and even sometimes require, communications from the public—and physicians in particular—regarding others' ability to drive. Thus, even if her particular disclosure violated confidentiality laws, Dr. Kim's letter fell within a category of communication permitted by law and was therefore within the purview of the privilege.

10

epileptic seizure. The victims subsequently sued the driver's neurologist based on the doctor's prior report to the DMV that the driver's epilepsy did not affect his ability to drive safely. (*Id.* at p. 679.) The appellate court held that none of the appellants' causes of action could stand because they all relied on the doctor's report to the DMV, which was clearly covered by the litigation privilege as a communication authorized by law submitted to the DMV to aid in determining driver safety. Appellant attempts to distinguish *Wang* because that case "concerned a report to the DMV that was required to get a license reinstated and that the patient requested the doctor to complete." (*Ibid*. at p. 680-681.) McNair also points out that there was no issue of a CMIA violation in *Wang*. We do not find either of these distinctions meaningful. Rather, as in *Wang*, Dr. Kim's letter was an authorized communication to the DMV to aid that quasi-judicial agency in determining McNair's driving capabilities. As such, it was covered by the privilege.

Indeed, McNair does not even argue on appeal that Dr. Kim's letter, as a general matter, fails to meet the criteria for application of the litigation privilege. Rather, he cites authority for an exception to the litigation privilege, under which courts have refused to apply the privilege when its general provisions conflict with a specific statute. Under this line of cases, application of the litigation privilege has been deemed inappropriate where the specific statute "would be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (See *Action Apartment*, *supra*, 41 Cal.4th at pp. 1237, 1246 [City of Santa Monica Tenant Harassment ordinance]; see also *Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 337-340 [Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788)]; *Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563, 1577 [Child Abuse and Neglect Reporting Act]; *Begier v. Strom* (1996) 46 Cal.App.4th 877, 884-885 [same].) According to McNair, application of the litigation privilege in this case would eliminate safeguards governing disclosures of medical information that the Legislature sought to protect in the CMIA and would therefore render the CMIA "significantly or wholly inoperable." We are not convinced.

11

The CMIA "was originally enacted . . . 'to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information.' [Citation.]" (*Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 38.) By its express terms, the CMIA recognizes that its confidentiality mandate is not absolute. Rather, section 56.10 enumerates numerous instances where disclosure of confidential information is either mandatory or permissive. In particular, subdivision (c)(14) of section 56.10 (subdivision (c)(14)) states: "(c) A provider of health care or a health care service plan may disclose medical information as follows . . . (14) The information may be disclosed when the disclosure is otherwise specifically authorized by law . . . ." (§ 56.10 (c)(14).) The City is correct in describing subdivision (c)(14) as a "catchall provision" as it "serves as the residuary clause in section 56.10. It legitimizes a myriad of situations the Legislature may not have cared to spell out, by establishing the principle of permissive disclosure when specifically authorized by law." (*Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1414 (*Shaddox*).)[4]

Here, Dr. Kim's disclosure was arguably "specifically authorized" under Health and Safety Code section 103900, subdivision (a) (section 103900(a)), which provides as follows: "Every physician and surgeon shall report immediately to the local health officer in writing, the name, date of birth, and address of every patient at least 14 years of age or older whom the physician and surgeon has diagnosed as having a case of a disorder characterized by lapses of consciousness. *However, if a physician and surgeon reasonably and in good faith believes that the reporting of a patient will serve the public interest, he or she may report a patient's condition even if it may not be required under*

---

[4] We reject McNair's argument that, because many of the mandatory disclosure provisions found in subdivision (b) of section 56.10 deal with disclosures in judicial or quasi-judicial proceedings, all such disclosures must be compelled rather than voluntary. To the contrary, several of the permissive disclosures authorized by subdivision (c) of section 56.10 involve judicial proceedings. (§ 56.10, subds. (c)(8)(A) [certain proceedings in which an employer and an employee are parties] & (c)(12) [conservatorship/guardianship proceedings].) As we read the statute, voluntary disclosures are permitted in the litigation context where authorized by some provision of subdivision (c), including the catchall provision found in subdivision (c)(14).

12

*the department's definition of disorders characterized by lapses of consciousness pursuant to subdivision (d).* (Health & Saf. Code, § 103900(a), italics added.) Unsurprisingly, McNair and the City argue over the application of section 103900(a) in this case. McNair, for instance, stresses that Dr. Kim did not comply with the exact terms of section 103900(a) because she forwarded her letter directly to the DMV rather than to the "local health officer" as required by the statute. The City, in contrast, claims that it was the pattern and practice at the MHHC for physicians to send letters directly to the DMV. It further asserts that Dr. Kim sent the letter out of her concern for the safety of her patient and the public. Thus, the disclosure was in the public interest as required by the statute. Arguably, some or all of these contentions raise triable issues of material fact, which would make summary adjudication inappropriate. For purposes of determining whether resort to the litigation privilege was proper under the circumstances of this case, however, we need not finally determine whether Dr. Kim's letter was, in fact, issued in compliance with section 103900(a).

Rather, employing an analysis similar to that used by this Division in *Shaddox*, *supra*, 110 Cal.App.4th 1406, we conclude that—because California has a policy of encouraging reports regarding suspected unsafe drivers—subdivision (c)(14) must be construed in a way that will not impede voluntary reports of the type generated by Dr. Kim, "reports whose importance is already recognized and immunized by section 47, subdivision (b)(3)." (See *Id.* at p. 1418.) In *Shaddox*, a police officer (Shaddox) in the San Francisco Police Department (SFPD) sued his dentist alleging a violation of the CMIA, invasion of privacy, and intentional and negligent infliction of emotional distress based on the dentist's report to the SFPD that Shaddox might be dependent on prescription pain medication. (*Id.* at p. 1409-1410.) The Court held, on "separate and independent grounds," that the dentist's disclosure of Shaddox's medical information was

13

both lawful under subdivision (c)(14) and privileged pursuant to section 47(b)'s litigation privilege.[5]  (*Id*. at p. 1409, 1418.)

The *Shaddox* court's analysis of the applicability of the litigation privilege focused, as does ours in this case, on the need " ' "to assure utmost freedom of communications between citizens and public authorities whose responsibility is to investigate and remedy wrongdoing. . . ." ' " (*Shaddox*, *supra*, 110 Cal.App.4th at pp. 1415-1416.)  Because the dentist in *Shaddox* was "alerting the SFPD about one of its officers possibly having a problem that could impair his ability to perform the vital public safety responsibilities entrusted to a metropolitan law enforcement agency," and because his communication led to an authorized investigation, the communication qualified as one made "in the course of an 'official proceeding authorized by law' and was consequently privileged." (*Id.* at p. 1417.)

With respect to the potential violation of the CMIA, the *Shaddox* court emphasized that "California has a policy of encouraging reports concerning suspected misconduct or unfitness by law enforcement officers." (*Shaddox*, *supra*, 110 Cal.App.4th at p. 1412.)  Specifically, the court pointed to a local ordinance encouraging citizens to report claims of misconduct and a state statute requiring each law enforcement agency to establish a procedure for investigating such complaints.  (*Id.* at pp. 1412-1413.)  Although none of the referenced statutes expressly authorized the disclosure of confidential information, the court concluded that this did not exclude them from the reach of subdivision (c)(14) because they involved a particular type of communication authorized by law.  (*Id.* at pp. 1413-1414, 1418.)  The *Shaddox* court also highlighted the

---

[5] McNair's contention that *Shaddox* pre-dated HIPAA and is thus irrelevant lacks merit. HIPAA does not provide a private right of action and we agree with the City that "state law immunity may bar private suits consistent with federal statutes that afford no private right of action." (*Doe v. Bd. of Trs. of the Univ. of Ill.*, 429 F.Supp.2d 930, 944 (N.D. Ill. 2006) ["[e]very court to have considered the issue . . . has concluded that HIPAA does not authorize a private right of action"]; see *Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 282-283.) Moreover, we find the question of whether Dr. Kim's disclosure violated HIPAA to be analytically distinct from the question of whether such disclosure was authorized under the CMIA.

important public safety concerns implicated by the dentist's report and noted that "issues of public safety may be paramount to personal privacy." (*Id.* at p. 1418.) In this regard, the court quoted the seminal case of *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, in which our Supreme Court concluded: " '[T]he public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. *The protective privilege ends where the public peril begins.*' " (*Shaddox*, *supra*, 110 Cal.App.4th at p. 1418.) And, the dentist's report was one the importance of which was recognized and immunized by the litigation privilege. (See *ibid.*) Under all of these circumstances, the *Shaddox* court determined that the dentist's disclosure in that case was authorized under subdivision (c)(14) and therefore not violative of the CMIA. (*Id.* at pp. 1418.)

As we read *Shaddox*, a voluntary disclosure of confidential medical information falls within the reach of subdivision (c)(14) of section 56.10 if a public policy exists encouraging such disclosure; the disclosure involves issues of public safety; and it is a communication which would otherwise be immunized by the litigation privilege. In this case, California clearly has a policy of encouraging, and sometimes even mandating, reports regarding suspected unsafe drivers. As described above, the DMV website indicates that the agency finds out about persons who may be unsafe to drive from many sources, including physicians and members of the public. Section 103900(a) expressly contemplates disclosure of even confidential information to the DMV where public safety is implicated. Moreover, "[t]he DMV is a public agency, authorized to conduct an investigation to determine whether the license of any person should be suspended or revoked. (Veh. Code, § 13800.) The department's proposed decision to revoke or suspend a person's driver's license is subject to an evidentiary hearing and decision by an administrative officer or body, as well as review by the courts. (Veh. Code, § 14100 et seq.)" (*Wise*, *supra*, 83 Cal.App.4th at p. 1303.) In addition, Dr. Kim's letter clearly implicated issues of public safety, as she was disclosing a problem that could impair McNair's ability to perform the public safety duties entrusted to him as a bus driver.

15

Finally, this is a situation where the importance of the report has already been recognized and immunized by the litigation privilege. In short, we find this situation essentially indistinguishable from that confronted by the *Shaddox* court, and therefore, conclude that Dr. Kim's disclosure was authorized under subdivision (c)(14). As a consequence, it was not violative of the CMIA, regardless of whether it complied with all of the technical requirements of section 103900(a). Under such circumstances, it cannot be argued that application of the litigation privilege would render the CMIA significantly or wholly inoperable. We, therefore, see no error in the trial court's application of the litigation privilege to foreclose McNair's intentional tort cause of action in this case.[6]

## B. Nonsuit on the Breach of Contract Cause of Action

### 1. Standard of Review

A defendant moves for nonsuit in order to test the sufficiency of the plaintiff's evidence before presenting his or her evidence to the trier of fact. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838, fn. 4.) "A defendant is entitled to nonsuit if the trial court determines as a matter of law that plaintiff's evidence, when viewed most favorably to the plaintiff under the substantial evidence test, is insufficient to permit a jury to find in his favor." (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 713.) On appeal, we review a grant of nonsuit de novo. (*Saunders v. Taylor* (1996) 42 Cal.App.4th 1538, 1541-1542.) Reversal of a judgment of nonsuit is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ . . . ." (*Ulwelling v. Crown Coach Corp.* (1962) 206 Cal.App.2d 96, 104-105.)

---

[6]*Pettus v. Cole* (1996) 49 Cal.App.4th 402 (*Pettus*), relied on by McNair as authority for the notion that the litigation privilege would render the CMIA's permissible disclosure provisions significantly or wholly inoperable is clearly distinguishable. In *Pettus*, the court determined that the litigation privilege did not apply because the plaintiff's disability evaluation was not a quasi-judicial proceeding. (*Id*. at p. 437.) Because section 47(b) was inapplicable, the *Pettus* court examined the plaintiff's alternative argument— that the "more general privilege" in section 47, subdivision (c) applied. Obviously, the court's discussion of subdivision (c) has no bearing on this case.

16

## 2. *The Litigation Privilege*

The City argues that the trial court properly granted nonsuit on McNair's breach of contract cause of action because it is barred by the litigation privilege. McNair, in contrast, asserts that the litigation privilege generally applies only to causes of action in tort and not breach of contract. In *Navellier v. Sletten* (2003) 106 Cal.App.4th 763 (*Navellier II*)), this Division noted that, while certain earlier decisions had applied the litigation privilege to bar breach of contract claims, generally the privilege is "described as one that precludes liability in tort, not liability for breach of contract." (*Id*. at p. 773.) Without deciding the issue, we further remarked that these prior cases did not "discuss whether all breach of contract actions involving privileged communication are necessarily precluded." (*Id*. at p. 773-774; see *Laborde v. Aronson* (2001) 92 Cal.App.4th 459, 461-463, disapproved on another point in *Musaelian v. Adams* (2009) 45 Cal.4th 512, 520; *Pollock v. Superior Court* (1991) 229 Cal.App.3d 26, 28-30.)

Since *Navellier II,* however, subsequent appellate decisions have clarified when the litigation privilege applies to breach of contract claims. For example, in *Wentland v. Wass* (2005) 126 Cal.App.4th 1484 (*Wentland*), the court held that the litigation privilege did not protect voluntary statements made in the course of litigation that breached an express confidentiality agreement. (*Id.* at p. 1489-1490.) The court concluded that "whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege." (*Id*. at p. 1492.) According to *Wentland*, those underlying policies are to "ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid unending litigation." (*Ibid*.) Ultimately, the court concluded that the litigation privilege did not apply because the breach at issue "was not simply a communication, but also wrongful conduct or performance under the contract." (*Id.* at 1494.) As the *Wentland* court saw it: "In reaching settlement . . ., the parties presumably came to an acceptable conclusion about the truth of [one party's] comments about [the other's] management of the partnership. Allowing such comments to be made in

17

litigation, shielded by the privilege, invites further litigation as to their accuracy and undermines the settlement reached in the [prior dispute]." (*Ibid*.)

In contrast, in *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1497, the appellate court concluded that the litigation privilege barred plaintiff's breach of contract claim because such a finding furthered the policies underlying the litigation privilege. *Feldman* involved an unlawful detainer action in which the tenants cross-complained on numerous grounds, including breach of contract, negligence, and wrongful eviction. (*Id.* at p. 1475.) All of these causes of action were premised on certain alleged harassing and threatening conduct by the landlord and its agents, including, ultimately, the filing of the unlawful detainer action. (*Id.* at 1493-1494, 1498.) The contract at issue was a basic sublease. (Id. at pp. 1473-1474.) Under such circumstances, the appellate court concluded that application of the privilege to bar the breach of contract claim furthered "the policy of allowing access to the courts without fear of harassing derivative actions." (*Id.* at pp. 1497-1498.)

More recently, in *Vivian* v. *Labrucherie* (2013) 214 Cal.App.4th 267 (*Vivian*), the appellate court held that the litigation privilege applied to bar a breach of contract claim where an ex-wife made voluntary statements about her ex-husband to a county sheriff's internal affairs department, in alleged violation of a settlement agreement previously negotiated by the parties in the context of litigation over a temporary restraining order. (*Id*. at p. 270-271, 276-277.) In that settlement agreement, each party agreed " 'not to disparage the other to any other party.' " (*Id.* at p. 270.) The court concluded that the litigation privilege applied to bar the ex-husband's breach of contract claim for two reasons. First, the settlement agreement did not "clearly prohibit" the conduct that the ex-husband challenged. Specifically, the term " 'disparage' " was viewed as somewhat ambiguous and thus the language of the agreement did not "expressly prohibit" the ex-wife from making statements to the internal affairs investigators. (*Id*. at p. 276-277.) Second, the application of the litigation privilege furthered the policies underlying the privilege. (*Id*. at p. 277.) In particular, and in contrast to *Wentland*, the dispute in the case involved "a significant public concern—a governmental investigation into

18

inappropriate conduct by a police officer." (*Ibid.*) Application of the privilege in such circumstances promoted "full and candid responses to a public agency, which is very much the purpose of the privilege and in the public interest." (*Ibid.*)

Under the analysis adopted in *Vivian*, application of the litigation privilege to bar McNair's breach of contract claim is clearly warranted in this case. With respect to the terms of the alleged agreement, for instance, none of the documents even potentially identified by McNair as part of the "[p]artly written, partly oral and partly implied" contract in this matter can be said to "clearly prohibit" Dr. Kim's conduct in this case. (*Vivian*, *supra*, 214 Cal.App.4th at p. 276.) Rather, as discussed above, the Consents all stated that McNair's medical records could be released by DPH when "permitted or required by law." And, pursuant to the HIPPA Privacy Notice and the DPH Summary Notice, McNair's confidential health information could be disclosed "when necessary to prevent a serious threat to your health and safety or the health and safety of the public or another person." Obviously, whether Dr. Kim's conduct in this case was justified under the laws detailed in these documents has been the subject of significant debate. Thus, regardless of whether her conduct may or may not ultimately be found to violate either state or federal law, it cannot be said that her actions were "clearly prohibited."

With respect to the second prong of the *Vivian* analysis, application of the litigation privilege in this case unequivocally furthers the policies underlying the privilege. In *Wang*, the court articulated the purpose of the privilege in the context of doctors' communications to the DMV, stating: "The litigation privilege ' "exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing." ' " (*Wang*, *supra*, 203 Cal.App.4th at p. 684.) Immunizing Dr. Kim from potential liability in this case for disclosing her public safety concerns to the DMV clearly advances this policy. Without such protection, a doctor might hesitate to report suspected harmful conditions or fail to truthfully and completely describe the scope of the potential problem. (See *Wentland*, *supra*, 126 Cal.App.4th at p. 1492 [general policies underlying the litigation privilege include ensuring "free access" to the courts and promoting "complete and truthful"

19

testimony]; see also *Williams v. Taylor* (1982) 129 Cal.App.3d 745, 753-754 [holding defendants' statements to the police regarding their suspicions of plaintiff's criminal activity absolutely privileged; there must be " 'an open channel of communication' " between citizens and public authorities where citizens can call attention to suspected wrongdoing].)  As the facts in this case satisfy both of the *Vivian* criteria, we conclude that the litigation privilege not only bars McNair's intentional tort claim, but his breach of contract claim as well.[7]

Indeed, our conclusion in this regard is buttressed by the Supreme Court's determination in *Jacob B.*, *supra*, 40 Cal.4th at p. 962, that common law, statutory, and constitutionally based claims for invasion of privacy are all barred by the litigation privilege.  In short, it is the gravamen of the cause of action rather than its designation that is controlling.  (*Ibid.*)  Here, both causes of action asserted by McNair are based solely on the propriety of Dr. Kim's letter to the DMV.  Thus, as in *Jacob B.*, McNair has found a "conveniently different label for pleading what is in substance an identical grievance arising from identical conduct."  (*Ibid.*; see also *Feldman v. 1100 Park Lane Associates, supra,* 160 Cal.App.4th 1467, 1497 [applying the litigation privilege to a breach of contract claim where the "same communicative conduct formed the basis for the tort and breach of contract causes of action"].)  Under such circumstances, application of the litigation privilege to bar both causes of action is appropriate.[8]

---

[7] The cases cited by McNair in opposition to this conclusion do not change our analysis. Rather, we agree with the City that these cases are all readily distinguishable as involving various express commercial contracts, with no articulated public safety concern.  (See *Wentland*, *supra*, 126 Cal.App.4th 1484 [breach of settlement agreement in partnership litigation]; *Paul v. Friedman* (2002) 95 Cal.App.4th 853 [confidentiality agreements executed as part of a failed mediation in a brokerage case]; *ITT Telecom Products Corp. v. Dooley* (1989) 214 Cal.App.3d 307 [breach of confidentiality agreement in trade secret context].)

[8] Because we conclude that both of McNair's claims are defeated by the litigation privilege, we do not consider the viability of the other grounds advanced for nonsuit in this case or the many challenges McNair makes to various pre-trial motions resolved by the trial court.

## III.   DISPOSITION

The judgment is affirmed.  Each party to bear their own costs.

_____
REARDON, J.

We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.


*McNair v. CCSF* A138952

22

Trial Court:                    City and County of San Francisco Superior Court


Trial Judge:                    Hon. Anne-Christine Massullo


Counsel for Plaintiff and       Katzenbach Law Offices
Appellant:                      Christopher W. Katzenbach


Counsel for Respondents:        Dennis J. Herrera
                                City Attorney
                                Owen Clements
                                Chief of Complex and Special Litigation
                                Erin Bernstein
                                Matthew Goldberg

*McNair v. CCSF* A138952