Filed 11/20/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT KLEM,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ACCESS INSURANCE COMPANY et al.,<br><br>    Defendants and Appellants. | D070623<br><br><br><br>(Super. Ct. No. 37-2016-00004859-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Reversed and remanded with directions.

Morris, Manning & Martin, Lewis E. Hassett; Boss Law Firm and Daniel R. Salas for Defendants and Appellants.

Day Law Offices and Montie Stowell Day for Plaintiff and Respondent.

Robert Klem sued Access Insurance Company (Access Insurance) and Access General Insurance Adjusters, LLC (Access Adjusters, and, collectively with Access Insurance, Access) after he was in a car accident and Access administered his claim. Klem alleged Access falsely notified the California Department of Motor Vehicles

(DMV) that his car was a total loss salvage, reducing its value and resulting in loss of use. Access filed a special motion to strike pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute. The trial court found Access's notice to the DMV was protected communication, but that Klem met his burden in establishing a probability of prevailing on the merits. The court denied the motion, and Access appealed.

We conclude the court erred as to certain of its evidentiary rulings and by denying the anti-SLAPP motion. Accordingly, we reverse and direct the court to enter a new order granting Access's motion.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I. *Events Giving Rise To The Litigation*

On February 12, 2014, Klem was driving his 1993 Mercury Tracer (the Vehicle) when he was in an accident with a car whose owner was insured by Access. Klem was insured by another company not at issue here. At the time, the Vehicle had approximately 92,300 miles on it.

Klem filed a claim with Access. The claims log indicates that on March 21, Access accepted liability for the accident and Klem stated he "want[ed] repairs" through them. Subsequent log entries noted Klem was in a rental car, and that the Vehicle was a total loss. Access Adjusters continued to communicate with Klem, with the log reflecting communications on March 31, April 8, and April 17.

---

[1] This summary is based on evidence admitted by the trial court, as well as evidence that we conclude was erroneously excluded, as discussed *post*.

On April 18, Access Adjusters sent Klem a letter regarding his claim, which stated in relevant part:

"We have attempted to reach you to discuss the settlement of your total loss claim. Our offer to settle your total loss claim is explained below and it is important that you review the offer and contact me to discuss the resolution of your claim. [¶] We have completed the inspection of your vehicle and it has been determined to be a Total Loss. Enclosed is a Total Loss Evaluation, which is an independent market evaluation of your vehicle. This evaluation was prepared based on the inspection of your vehicle and the comparison of your vehicle to other comparable vehicles . . . . [¶] This will confirm that you **will** retain your salvage vehicle in settlement of the total loss. [¶] . . . [¶]

"Pursuant to California Vehicle Code Section 11515(b), we have notified the [DMV] of the total loss of your vehicle and your retention of the salvage. A copy of the Notice of the Retention of Salvage has been enclosed for your records. . . . It is your responsibility, within ten days from the settlement of the loss, to forward the properly endorsed ownership certificate or other evidence of ownership to the [DMV] for the issuance of a Salvage Certificate. . . . [¶] If you keep your vehicle salvage . . . . Please be advised that the cost of the vehicle at resale and/or the insured value of the vehicle may be affected."

The notice of retention is DMV form REG 481, titled "Salvage Vehicle Retention by Owner." It states, in part:

"Insurance Company Reporting Retention of this Salvage Vehicle [¶] I, the undersigned, certify that the above described salvage vehicle has been retained by the owner(s) and, as required by California Vehicle Code § 11515(b), he/she has been notified that, within 10 days of the settlement of loss date, he/she must surrender the vehicle's Certificate of Title and license plates, and apply for a Salvage Certificate. The vehicle owner(s) has also been notified that the [DMVs'] database record for the vehicle will reflect a "Salvaged" notation (brand)."

3

Finally, the April 18 letter stated a check for the net settlement amount of $1,744.84 had been sent to Klem. Klem neither cashed the check, nor returned it. Klem and Access communicated on several more occasions, with Klem expressing his view that the Vehicle "should be worth more" and that he did not "agree with the comps."

Klem described his communications with Access in a declaration opposing Access's anti-SLAPP motion. He stated he advised Access he was repairing the Vehicle, it would "not be negotiated as a salvage vehicle," and that Access "was not to . . . report it to the [DMV] as a 'Salvage Title' vehicle." He also stated he refused to negotiate a total loss settlement. Klem represented that, prior to receipt of the April 18 letter, he "demanded $4,500.00, which would be [his] estimated value of the vehicle at the time of the accident less what [he] though[t] would be the salvage value." Following the letter, he told Access he would not accept the check as payment for a total loss, and "demanded that if the vehicle was to be determined a salvage title by settlement agreement that [he] be paid the full value of the vehicle." Klem stated he was "essentially advised that [he] had to accept the offered payment [for Access to pay the claim] . . . or that [he] would have to withdraw the claim . . ., while the vehicle continued to have against it the 'Salvage Title.' "

Klem also discussed his use and repair of the Vehicle. He had used the Vehicle to transport his severely ill wife (now deceased) to medical appointments, and it was "repaired by [him] . . . for [his] and [his] wife's benefit . . . " Klem "caused the necessary repairs to be made to the vehicle for the vehicle to be . . . in a safe working order" (but not cosmetic repairs), and continued driving it. The Vehicle later "developed an

4

unrelated engine problem," and because Klem could not register it without salvage title, he "decided it was not economical to repair . . . and . . . disposed of the vehicle by selling it to a salvage yard."

In January 2015, Klem's counsel sent Access's counsel a declaration and asked for it to be signed and returned. It stated, in part: "I, on behalf of 21st Century Insurance Company [*sic*], request[] that the Form REG 481 erroneously filed by Assess [*sic*] . . . be withdrawn. The filing . . . was erroneous in that the vehicle was not a 'Total Loss Salvage Title' vehicle as described in Vehicle Code section 544." Access did not provide the requested declaration.

## II.    *Litigation*

Klem sued Access in February 2016, asserting causes of action for slander of title and violation of Business and Professions Code section 17200 (the unfair competition law, or UCL). Klem alleged, in relevant part, that because he repaired the Vehicle, it was not a total loss salvage under Vehicle Code section 544 and, in turn, Access's submission of the REG 481 notice to the DMV was both false and a violation of section 11515 and other statutes.[2] As we discuss *post*, section 544 defines "total loss salvage vehicle," and section 11515 sets forth reporting requirements for such vehicles.

In April 2016, Access filed its anti-SLAPP motion and provided a declaration from Michael H. Meadows, Access Adjusters Senior Vice President, Chief Compliance Officer, which attached copies of the claims log and April 18 letter. Klem opposed the

---

[2]    Except as noted *post*, further statutory references are to the Vehicle Code. Klem also sued one of the claims personnel, but he is not a party to the appeal.

5

motion and filed his own declaration and that of his counsel in support. The parties objected to each other's declarations.

The trial court provided a tentative ruling. The court determined Access met its burden to establish protected activity, explaining the DMV notice "was a communication made 'in anticipation of the bringing of an action or other official proceeding.' " The court also noted "reporting of salvage vehicles to appropriate governmental agencies is a matter of significant public concern."

The court then concluded Klem established a probability of prevailing on his claims. It explained he "provide[d] evidence demonstrating that the vehicle should not have been classified as a 'total loss,' " while Access's "evidence [in] this regard [was] not admissible." The court also found Access's communication was not privileged. With respect to the absolute privilege under Civil Code section 47, subdivision (b), the court explained that "[a]lthough one potential outcome of the filing required by section 11515(b) is an investigation, it is not intended as a communication concerning possible wrongdoing, made to an official governmental agency such as a local police department."[3] The court then found Klem sufficiently alleged malice to overcome any qualified privilege, malice could be inferred from his evidence, and, again, that Access's evidence was inadmissible. The court also found "damages from the loss of use of the vehicle [were] alleged," and that the facts alleged gave rise to unfair or fraudulent

_____

[3] The court similarly noted, as to the first prong, that an investigation was a potential outcome "to the extent that the owner attempts to s[ell] the vehicle without disclosing its status as a total loss salvage vehicle."

6

conduct for purposes of the UCL claim. Finally, the court sustained Klem's objections to the Meadows declaration without analysis.

After a hearing, the trial court confirmed its tentative ruling and elaborated on its reasoning. Addressing the absolute privilege, the court determined Access presented "no authority that the reporting and licensing requirements mandated by . . . section 11515" were designed to prompt official action. The court also stated Klem's "lay opinion [was] sufficient prima facie evidence of the subject vehicle[']s status." The court overruled Access's objections to Klem's declaration and sustained most of its objections to his counsel's declaration. Access appealed.[4]

## DISCUSSION

I.  *Evidentiary Rulings*

Access contends the trial court erred by (1) sustaining Klem's objections to the claims log and April 18 letter, and (2) denying Access's objections to Klem's statements

---

[4]  The parties, and others seeking amicus status, made various requests in connection with this appeal. First, Access unsuccessfully demurred to the complaint and sought writ review, which we denied. *Access General Insurance Adjusters, LLC et al. v. The Superior Court of San Diego County/Klem* (Aug. 24, 2016, D070856) [nonpub. ord.].) Access now requests that if we find Klem's claims did not arise from protected activity, we construe the appeal as a writ and address the demurrer. This request is moot in light of our disposition. Second, Klem moved to dismiss the appeal as frivolous and dilatory, and requested judicial notice of Access's writ petition and this court's denial. We grant the request (Evid. Code, § 452, subd. (d)), but deny the motion; the appeal has merit, as addressed herein. Klem also sought judicial notice of an order to show cause from the California Department of Insurance to Defendants alleging unfair claims settlement practices. We deny this request because the document is irrelevant to this appeal. (*Mozetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 578; *People v. Rowland* (1992) 4 Cal.4th 238, 268, fn. 6.). Finally, we deny the request of Property Casualty Insurers Association of America to file an amicus brief.

7

in his declaration regarding the Vehicle's value and his repairs.  We "review the trial court's evidentiary rulings for an abuse of discretion."  (*Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1444 [addressing anti-SLAPP motion; *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1348, fn. 3 [accord].)

We begin with Access's evidence.  Klem objected to the claims log based on lack of personal knowledge, hearsay, multiple hearsay, and "lack of foundation" (for which he cited the business records exception to the hearsay rule).  He stated he had no objection to portions of the log that he identified as admissions against interest, consisting of excerpts from various entries and an absence of entries reflecting he agreed to salvage treatment. Klem objected to the April 18 letter on the same grounds, and because there was "No Foundation for Expert Witness Report."  Access argues these materials fall within the business records exception to the hearsay rule.  We agree.

Evidence Code section 1271 provides that "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule" if it meets the following requirements:  "(a) The writing was made in the regular course of a business; [¶]  (b) The writing was made at or near the time of the act, condition, or event; [¶]  (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and  [¶]  (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Meadows's declaration was sufficient to establish these requirements.  He explained it is the "general business practice" of Access Adjusters to "regularly make entries into the claims log," and to prepare and send letters.  Claims log entries are made

8

"at the time of the conversation or action . . . , or shortly thereafter," and logs and letter copies are maintained in the regular course of business. Meadows was a qualified witness (evidenced by his role as a senior compliance officer and familiarity "with the procedures, records, and record-keeping"), and he verified the documents were accurate copies. Lastly, the source of the information and time of preparation provide trustworthiness; the materials were prepared by claims personnel, during the claims process.

There remains a multiple hearsay issue as to statements within the claims log. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1205 [exception necessary "for each level of hearsay"].) Access does not address this issue, and we deem it forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.) However, our review is not materially impacted. Klem voluntarily exempted some statements from his objections, and others still serve as evidence that communications took place. (*Stewart v. Estate of Bohnert* (1980) 101 Cal.App.3d 978, 990 [statements used to establish conversation took place are not hearsay]; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, § 5.)[5]

---

5    Given Meadows's declaration and that the business records exception applies, we reject Klem's personal knowledge and foundation objections. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1012 ["So long as 'the person who originally feeds the information into the process [has] firsthand knowledge,' the evidence can . . . qualify as a business record."]; *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 322 [witness "need only be familiar with the procedures followed"].) In addition, to the extent the court excluded the April 18 letter as expert testimony lacking foundation, it erred in doing so. The letter was offered as part of Access's business records, not expert testimony.

We now turn to Klem's statements regarding the Vehicle's value and his repairs. Access argues Klem had not been qualified as an expert, and his statements were immaterial to value and repair under section 544. These arguments are not persuasive. First, there is no indication Klem offered the statements as expert evidence. Second, even if Klem's statements were irrelevant to whether the Vehicle was actually a total loss salvage under section 544, they were not necessarily irrelevant to other elements of Klem's claims. Access does not establish an abuse of discretion.

## II.    *Overview Of The Anti-SLAPP Statute*

The anti-SLAPP statute "authorizes defendants to file a special motion to strike '[a] cause of action against a person arising from' the petition or speech activities 'of that person . . . in connection with a public issue.' (Code Civ. Proc., § 425.16, subd. (b)(1).)" (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 (*Park*) [accord].) Relevant here, an act in furtherance of speech or petition rights includes a "writing made in connection with an . . . official proceeding" (Code Civ. Proc., § 425.16, subd. (e)(2)) and "conduct in furtherance of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e)(4)). " '[T]he defendant's act underlying the plaintiff's cause of action must itself have been an act in furtherance of the right of petition or free speech.' " (*Park*, at p. 1063.)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by [Code of Civil Procedure,] section 425.16. [Citation.] If the defendant makes the required showing, the

burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384.)  At the second step, the court's "inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Id.* at pp. 384-385.)

" 'We review de novo a ruling on a special motion to strike under [Code of Civil Procedure,] section 425.16.  [Citation.]  Thus, we apply our independent judgment, both to the issue of whether the cause of action arises from a protected activity and whether the plaintiff has shown a probability of prevailing on the claim.' " (*South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 657 (*South Sutter*); *Park, supra*, 2 Cal.5th at p. 1067.)[6]

---

[6]     Klem argues we should review for abuse of discretion at the second step because Code of Civil Procedure section 425.17 recognizes a plaintiff's constitutional rights in the anti-SLAPP context.  We disagree.  Independent review at both steps is well-settled, including after passage of section 425.17.  (E.g., *South Sutter*, *supra*, 193 Cal.App.4th at p. 657.)  He also suggests Access's anti-SLAPP motion raises constitutional concerns generally; i.e., this lawsuit is his only means of redress and he has a right to a jury trial.  Anti-SLAPP is no impediment to redress of grievances or jury trial rights.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 63; *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 864-868.)

### III.     *Analysis*

A.     *Prong One:  The Trial Court Properly Concluded Access's Submission Of The REG 481 Notice Was Protected Communication*

The first issue in our anti-SLAPP analysis is whether, as the trial court determined, Klem's claims arise from protected activity.

"[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.' " (*Park*, *supra*, 2 Cal.5th at p. 1063.)  The activity allegedly giving rise to Access's liability is its submission to the DMV of the REG 481 notice, which indicated the Vehicle was a total loss salvage.  The trial court concluded this communication was protected speech.  Although we question the court's finding that Access sent the REG 481 notice in anticipation of an official proceeding (and conclude *post* it was not intended to trigger such proceedings for privilege purposes), we agree it related to a public issue or an issue of public interest.  (Code Civ. Proc., § 425.16, subd. (e)(4).)

As we discuss *post*, the Legislature enacted section 544 to identify salvage vehicles and address related concerns, and passed other laws with requirements for such vehicles.  (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 377 ["statements of intent and . . . legislation . . . reflect heightened concern . . . and widespread public interest" in subject].)  Although an insurer may have a particular interest in salvage vehicle reporting (as an entity that is charged with reporting duties and whose business implicates vehicle status), anyone who sells, purchases, or drives cars in California is impacted by these communications.  (See *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th

12

468, 479 [public interest has "been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity"].)

Klem did not file a protective cross-appeal contesting the trial court's prong one analysis, but now argues Access failed to meet its burden because its conduct was illegal and because the public interest exception applies to his UCL claim. A prevailing party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning. (See *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 80; see also *San Diegans for Open Government v. Har Construction, Inc.* (2015) 240 Cal.App.4th 611, 627-628 [Code Civ. Proc., § 425.17 presents threshold anti-SLAPP issue].) Therefore, we address Klem's contentions, and we reject them.[7]

With respect to illegality, there is a "narrow circumstance in which a defendant's assertedly protected activity could be found to be illegal as a matter of law and therefore not within the purview of [Code of Civil Procedure,] section 425.16"; namely, "where either the defendant concedes the illegality of its conduct or the illegality is conclusively shown by the evidence, the motion must be denied." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 315-316 (*Flatley*); *id.* at p. 316 [if "a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step"].) "[T]he . . . use of the phrase 'illegal' " in *Flatley* "was intended to mean criminal, and not merely violative of a statute." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182

---

7    Access also suggests Klem did not adequately raise these issues below. Although it is not clear he did so, they lack merit regardless.

Cal.App.4th 1644, 1654.) Access has not conceded illegal conduct, and Klem has provided no conclusive evidence of illegality.

In support of his assertion that Access's conduct was illegal, Klem identifies two statutes involving criminal penalties. As discussed *post*, section 11515 requires insurers and owners to provide certain notices and materials to the DMV in connection with total loss salvage vehicles. Under section 11515, subdivision (g), a violation of these requirements is a misdemeanor or infraction. Klem contends this provision makes "the false reporting of the vehicle as a 'total loss salvage vehicle' " a criminal act. But section 11515, subdivision (g), does not impose penalties for voluntary reports, false or otherwise, and Access maintains the Vehicle *was* a total loss salvage. Klem also provides no reasoned argument or authority to support his interpretation and we do not consider it further. (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [" 'The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' "].)

Similarly, Penal Code section 550 applies to insurance fraud by claimants, not actions by insurers. (*Id*., § 550, subd. (a)(1) [penalizing one who, among other things, "[k]nowingly present[s] . . . any false or fraudulent claim for the payment of a loss or injury"]; see, e.g., *State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 451 (*Nee*) [rejecting claim against insurer; describing § 550 as "tool[] to combat insurance claims fraud perpetrated against insurance companies"].) Klem argues Access could be liable for making statements in "opposition to" a claim. (See Pen. Code, § 550, subd. (b) [penalizing one who knowingly presents false statement supporting or

"in opposition" to a claim].)  We disagree.  "Insurers do not 'support' or 'oppose' claims, they 'approve' or 'deny' them.  Nor do insurers submit 'statements' as part of 'a claim for payment.' "  (*Nee*, at p. 450; *ibid.* ["These provisions might apply, for example, to a doctor . . . .  They do not apply to the insurance company . . . ."].)

We now address Klem's argument regarding the public interest exception.  Specifically, Klem contends his UCL claim is brought on behalf of the public and the public interest exception therefore applies.  We disagree.

The exception provides:  "Section 425.16 does not apply to any action brought solely in the public interest or on behalf of the general public if all of the following conditions exist:  [¶]  (1) The plaintiff does not seek any relief greater than or different from the relief sought for the general public . . . .  [¶]  (2) The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit, . . . on the general public . . . .  [¶]  (3) Private enforcement is necessary and places a disproportionate financial burden on the plaintiff . . . ."  (Code Civ. Proc., § 425.17, subd. (b).)  The exception "applies only when the entire action is brought in the public interest."  (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312; *id.* at p. 317 ["[t]he statutory language . . . is unambiguous and bars a litigant seeking 'any' personal relief from relying on the [§] 425.17(b) exception"].)  Klem's lawsuit does not fall within the exception.  His slander of title claim concerns only himself, not the public.  Tellingly, in his UCL claim, Klem states "Plaintiff seeks on his own behalf treble damages . . . ."  We conclude Klem seeks relief "different from the

15

relief sought for the general public" (§ 425.17, subd. (b)(1)), and the public interest

exception does not apply. We need not address the remaining elements.

B. *Prong Two: Access Establishes The Trial Court Erred In Finding Klem Showed A Probability Of Prevailing At Trial*

We next consider whether Access has demonstrated the court erred in concluding

Klem could prevail at trial.

1. *Applicable Law*

The key provisions at issue here are sections 544 and 11515. Section 544 provides

that " 'Total loss salvage vehicle' " means either of the following:

> "(a) A vehicle, other than a nonrepairable vehicle, of a type subject
> to registration that has been wrecked, destroyed, or damaged, to the
> extent that the owner, leasing company, financial institution, or the
> insurance company that insured or is responsible for repair of the
> vehicle, considers it uneconomical to repair the vehicle and because
> of this, the vehicle is not repaired by or for the person who owned
> the vehicle at the time of the event resulting in damage.

> "(b) A vehicle that was determined to be uneconomical to repair, for
> which a total loss payment has been made by an insurer, whether or
> not the vehicle is subsequently repaired, if prior to or upon making
> the payment to the claimant, the insurer obtains the agreement of the
> claimant to the amount of the total loss settlement, and informs the
> client that, pursuant to subdivision (a) or (b) of section 11515, the
> total loss settlement must be reported to the Department of Motor
> Vehicles, which will issue a salvage certificate for the vehicle."

Section 11515 sets forth the duties of insurers and vehicle owners when there is a

total loss salvage determination:

> "(a)(1) Whenever an insurance company makes a total loss
> settlement on a total loss salvage vehicle, the insurance
> company, . . . , within 10 days from the settlement of the loss, shall
> forward the properly endorsed certificate of ownership . . . , the
> license plates, and a fee . . . , to the department. . . .

16

"(b) Whenever the owner of a total loss salvage vehicle retains possession of the vehicle, the insurance company shall notify the department of the retention on a form prescribed by the department. The insurance company shall also notify the insured or owner of the insured's or owner's responsibility to comply with this subdivision. The owner shall, within 10 days from the settlement of the loss, forward the properly endorsed certificate of ownership . . . , the license plates, and a fee . . . to the department. . . .  The department, upon receipt of the certificate of ownership or other evidence of title, the license plates, and the fee, shall issue a salvage certificate for the vehicle.

"(c) Whenever a total loss salvage vehicle is not the subject of an insurance settlement, the owner shall, within 10 days from the loss, forward the properly endorsed certificate of ownership . . . , the license plates, and a fee . . . to the department.  [¶] . . . [¶]

"(g) A violation of subdivision (a), (b), (d), or (e) is a misdemeanor. . . .  [A] violation of subdivision (c) is an infraction, except that, if committed with the intent to defraud, a violation of subdivision (c) is a misdemeanor."

We address other legal authorities as relevant to our analysis, *post*.

2.    *Access Establishes Klem Could Not Prevail On His Slander of Title Claim*

Access contends Klem failed to introduce sufficient evidence to prove his slander of title claim.  We agree.

To establish slander of title, a plaintiff must show:  "(1) a publication, (2) which is without privilege or justification, (3) which is false, and (4) which causes direct and immediate pecuniary loss."  (*Manhattan Loft, LLC v. Mercury Liquors, Inc.* (2009) 173 Cal.App.4th 1040, 1051.)  We conclude Access's submission of the REG 481 notice was not absolutely privileged.  However, the communication was qualifiedly privileged

and, regardless, Access establishes Klem did not show a likelihood of proving the REG 481 notice was false or that it caused him pecuniary loss.

a. *Access's Submission Of The REG 481 Notice Was Not Absolutely Privileged*

We now address Access's argument that its communication was absolutely privileged. This argument lacks merit.

Civil Code section 47, subdivision (b), "confers an absolute privilege to communications made as part of a ' "judicial or quasi-judicial proceeding," ' defined to include any sort of ' "truth-seeking" ' or other official proceeding." (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 282 (*Hawran*).) " 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' " (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.) The privilege " 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' " (*Ibid.*) While we recognize the absolute privilege is "broadly applied and doubts are resolved in its favor" (*Hawran,* at p. 283), Access has not established its communication was made prior to an official proceeding.

In *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350 (*Hagberg*), the California Supreme Court provided significant guidance on communications that are made in anticipation of official proceedings. (*Id.* at pp. 363-366, 375 [holding citizen

18

reports of criminal wrongdoing to police were absolutely privileged].)  The Court explained that "the critical question is the *aim* of the communication, not the forum in which it takes place.  If the communication is made 'in anticipation of or [is] designed to prompt official proceedings, the communication is protected.' "  (*Id*. at p. 368.)  The privilege thus "applies to complaints to governmental agencies requesting that the agency investigate or remedy wrongdoing."  (*Hagberg*, at p. 363; see *id.* at p. 370 ["communications are privileged . . . when they are intended to instigate official governmental investigation into wrongdoing"]; *Hawran*, *supra*, 209 Cal.App.4th at p. 282 [accord].)

Consistent with these principles, courts have applied the absolute privilege to accusations of fraud and other improprieties.  (See, e.g., *Fremont Comp. Ins. Co. v. Superior Court* (1996) 44 Cal.App.4th 867, 876-877 [report to Department of Insurance and district attorney's office accusing physician of fraud]; *Long v. Pinto* (1981) 126 Cal.App.3d 946, 948 [letter to state board implicating physician for performing unnecessary surgeries]; *Fontani v. Wells Fargo Investments, LLC* (2005) 129 Cal.App.4th 719, 731-733 (*Fontani*) [employee termination notice (Form U–5) filed with the National Association of Securities Dealers (NASD) was privileged; "an NASD investigation [was] at least one potential consequence of a Form U–5 filing that contains allegations of improper conduct by a broker-dealer"], disapproved on other grounds in *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 203, fn. 5.)

The absolute privilege does not apply to communications insufficiently related to investigation or remedy of wrongdoing.  (See, e.g., *Katz v. Rosen* (1975) 48 Cal.App.3d

19

1032, 1037 (*Katz*) [absolute privilege did not apply to letter to local bar association regarding attorney conduct, explaining "local bar associations are powerless to impose legal sanctions against ethical abuses"]; cf. *Hawran*, *supra*, 209 Cal.App.4th at 281, 285-286 [press release following Form 8–K filing with SEC not pursuant to official proceeding and not privileged; declining to extend *Fontani*, explaining "the Form 8–K . . . may have some relation to the SEC proceeding . . . .  But unlike the Form U–5, which is a report of wrongdoing . . . and may be a precursor to an investigation, the Form 8–K is required . . . irrespective of the existence or status of any SEC proceeding or investigation" and the press release was "merely related" to the Form 8–K].)

Access's primary argument is that the absolute privilege has been applied to DMV reports.  But the cases cited by Access are inapposite because the communications at issue implicated the DMV's investigatory and decisionmaking functions.  For example, in *Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, the Court of Appeal held the privilege applied to a letter to the DMV regarding drug use and fitness to drive.  (*Id.* at pp. 1301, 1303.)  The court explained:

> "The DMV is . . . authorized to conduct an investigation to
> determine whether the license of any person should be suspended or
> revoked. . . .  The department's proposed decision to revoke or
> suspend a person's driver's license is subject to an evidentiary
> hearing and decision . . . .  Thus, Mr. Wise's report to the DMV
> regarding his wife's drug usage and its possible impact on her ability
> to safely operate a motor vehicle squarely falls within the privilege
> for quasi-judicial proceedings."

See also *Wang v. Heck* (2012) 203 Cal.App.4th 677, 681, 686 (absolute privilege applied to report to DMV that driver's epilepsy did not affect his ability to drive safely, subject to

20

medication use); *McNair v. City and County of San Francisco* (2016) 5 Cal.App.5th 1154, 1159, 1163 (privilege applied to letter to DMV indicating physician learned of patient's commercial driver's license and believed it was "in the interest of public safety that the DMV [was] aware" he had been diagnosed with a cognitive disorder).[8]

Here, in contrast, Access does not contend, much less establish, that the DMV acts in an investigatory or decisionmaking capacity in connection with the REG 481 notice, or that its notice was intended to trigger such activity. Pursuant to section 11515, subdivision (b), once the DMV receives the REG 481 notice indicating a vehicle's salvage status, as well as the certificate of title, license plates, and fee, the DMV issues a salvage certificate. Nothing in the text of section 11515 or the REG 481 notice, or the record here, suggests that submission of the REG 481 notice results in an investigation. Indeed, the DMV "has no discretion to reconsider the total loss salvage vehicle determination." (*Moran v. Department of Motor Vehicles* (2006) 139 Cal.App.4th 688,

---

[8]     Access also relies on *Plumleigh v. City of Santa Ana* (C.D. Cal. 2010) 754 F.Supp.2d 1201, 1206-1207, where the district court concluded a traffic control camera company's reports to the government were protected under anti-SLAPP (citing the litigation privilege). Access notes the company's obligations under its contract, and contends that whether the company "intended to trigger an investigation was irrelevant." However, the *Plumleigh* court did not focus on the company's contractual obligations, and did address the investigatory purpose of the reports. (*Id.* at p. 1207 ["Providing photographic data, like *reporting suspected wrongful conduct to the police*, is directly linked to the Police Department's determination whether to issue a traffic citation . . . ."], italics added.)

21

693 (*Moran*).) The trial court properly concluded that Access's sending of the REG 481 notice to the DMV was not absolutely privileged.[9]

Access's other arguments are similarly unpersuasive. First, Access maintains intent is irrelevant, citing cases holding that motive is immaterial to whether the communication is in furtherance of or logically related to an official proceeding. (See, e.g., *Silberg v. Anderson* (1990) 50 Cal.3d 205, 220 ["[t]he 'furtherance requirement was never intended as a test of a participant's motives, morals, ethics or intent.' "]; *City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 382 [logical relation prong " ' "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case" ' "].) The general principle Access cites is not in dispute. But where, as here, there is no existing proceeding, there must be *some* indication the communication was aimed at bringing about one. (See *Hagberg*, *supra*, 32 Cal.4th at p. 362.)[10]

---

9    We note the trial court suggested an investigation could result from a report under section 11515, subdivision (b), if an owner tried to sell a salvage vehicle without disclosing its status (while still finding Access did not intend to trigger official action). The requirement that a seller disclose salvage status (by providing the salvage certificate) is found in section 11515, subdivision (e), not section 11515, subdivision (b). And while the DMV may learn of a salvage vehicle from a REG 481 notice, it would be the noncompliant vehicle sale that would lead to an investigation, not the sending of the REG 481 notice.

10    Access also argues that requiring intent to trigger government action would "defeat the purpose of the privilege" and fact-based inquiries would be needed, citing *Equilon, supra*, 29 Cal.4th at page 58. *Equilon* held a defendant moving under anti-SLAPP need not establish the plaintiff intended to chill protected conduct. (*Ibid.*) It did not relieve the defendant of showing the communication related to an official proceeding, where that was the ground for protection. The same is true here.

22

Second, Access contends the trial court did not consider its "mandatory" reporting obligations. We are not persuaded. Even if Access's total loss salvage determination was sound (and it was, as we conclude *post*), it is not clear that Access was required to send the REG 481 notice. The notice would have been needed if Klem agreed to settle (§§ 544, subd. (b), 11515, subd. (b)), and not needed if Klem never filed a claim or Access never sent Klem a payment (in which case Klem would have borne any reporting obligation, under § 11515, subd. (c)). But these provisions are ambiguous as to a claimant who, like Klem, receives a payment, but does not agree to settle. Section 544 addresses only agreed-upon settlements, and section 11515, subdivision (b), uses the term "settlement of loss," but does not address agreement. We recognize, as Access notes, that the insurance claims regulations impose on insurers certain requirements for payments. (10 Cal. Code Regs., §§ 2695.7, 2695.8.) But the claims regulations provide no insight as to reporting under section 11515, much less in the situation presented here. However, we need not resolve this issue, because even if the REG 481 notice were required, it still would not be privileged unless it related to or intended to cause commencement of an official proceeding—which Access has not established.[11]

   b. *Access's Submission Of The REG 481 Notice Was Qualifiedly Privileged*

---

[11] Access makes one additional argument here, contending the trial court erroneously limited the privilege to police reports. We disagree. The court simply cited a police report as an example in its tentative ruling; its final order makes clear its concern was with Access's failure to establish an official proceeding of any kind.

23

Access argues that even if its submission of the REG 481 notice was not absolutely privileged, it is protected by the qualified privilege under Civil Code section 47, subdivision (c). We agree.

A qualified privilege applies to "a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (Civ. Code, § 47, subd. (c).) "The defendant has the initial burden of showing the . . . statement was made on a privileged occasion, whereupon the burden shifts to the plaintiff to show the defendant made the statement with malice." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 915 (*Kashian*).)

The privilege is " 'recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest.' " (*Hawran*, *supra*, 209 Cal.App.4th at p. 287.) It has been found to apply where the interest is "something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest." (*Ibid.* [privilege "restricted to 'proprietary or narrow private interests.' "].) "This definition is not exclusive, however, and the cases have taken an 'eclectic approach' toward interpreting the statute." (*Kashian*, *supra*, 98 Cal.App.4th at p. 914; see, e.g., *Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 4 [qualified privilege applied to letter from physical education professor to athletic organizations and sports

24

magazines, criticizing plaintiff's "sports-specific" psychological testing]; *Katz, supra*, 48 Cal.App.3d 1032, 1037 [qualified privilege applied to physician's letter to local bar association, regarding attorney's allegedly unethical conduct].)

" ' "The malice necessary to defeat a qualified privilege is 'actual malice' which is established by a showing that the publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and thereafter acted in reckless disregard of the plaintiff's rights [citations]." ' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721.)

The trial court erred in finding the qualified privilege did not apply to Access's submission of the REG 481 notice to the DMV. Although Access and the DMV do not have a business relationship, they do share a common interest in the reporting of total loss salvage vehicles.[12] As an insurer, Access is required to report total loss salvage vehicles in certain circumstances. (§ 11515.) Access may also benefit from reporting by others; because it makes payments in connection with damaged vehicles, vehicle salvage history may be relevant to its business. The DMV is required to receive such reports and issue salvage certificates. (§ 11515.) The DMV also has other obligations relating to salvage vehicles, such as noting this status on the vehicle's registration. (§§ 4450, 4453.) We conclude Access and the DMV have a common interest in reporting of total loss salvage

---

[12] We recognize Access asserted the existence of a qualified privilege in both the trial court and this court, without elaborating on the common interest here. However, we conclude Access sufficiently raised the issue and the existence of the privilege is ordinarily a question of law. (*Kashian, supra*, 98 Cal.App.4th at p. 915.)

25

vehicles and Access's submission of the REG 481 notice was reasonably calculated to advance that interest.

Thus, the burden then shifted to Klem to provide evidence of malice. He has not done so. Klem does not appear to address this issue in his respondent's brief (other than to characterize Access's conduct as malicious), but we infer his position from his other arguments, his complaint, and opposition brief below. Klem appears to argue, in substance, that Access improperly used the REG 481 notice to lower the value of his Vehicle and force settlement. By way of evidence, he notes the Access representative's statements regarding his options (i.e., accept the settlement, or withdraw the claim) and Access's refusal to sign the declaration provided by Klem's counsel indicating the Vehicle was not a total loss salvage.

As an initial matter, Klem's apparent premise—that a salvage title *causes* a reduction in vehicle value—is flawed. A total loss salvage determination follows an accident. It is the accident that causes the vehicle's damage, any subsequent value reduction, and, where warranted under section 544, a salvage title. Klem identifies no evidence a salvage title even necessarily correlates with a lower value.[13] But to the extent it does, this correlation simply reflects that a vehicle with damage history may have reduced value. And the REG 481 notice is just one way the DMV learns a salvage title is needed. Conceivably, a REG 481 notice not based on a total loss evaluation (or based on a false or incorrect one) could lead to the issuance of an unnecessary salvage

---

[13]    Klem requested judicial notice that a vehicle with a salvage brand has "less value" than a vehicle without one, but the court denied the request and Klem has not appealed it.

26

title and unwarranted value reduction. But, as we explain *post,* here Access did complete a total loss evaluation and Klem provides no evidence it was false.

Klem's evidence does not reflect any ill will on Access's part. There was nothing nefarious about accurately informing Klem regarding his options as to his claim. It was also reasonable for Access's counsel to refuse to sign Klem's counsel's declaration, which identified the wrong insurance company and stated a conclusion contrary to Access's total loss salvage determination.

Ultimately, Klem provides no evidence Access sent the REG 481 notice to reduce the Vehicle's value or induce settlement, rather than to comply with what Access believed to be its statutory obligations in light of its total loss evaluation. Klem does cite "the records of Access," but does not provide a record reference. We recognize Access's April 18 letter advised Klem he had to obtain a salvage title and the Vehicle's value may be affected. However, we do not view this as an admission that Access *intended* such value reduction. Read in context, it appears Access was simply observing a salvage title may correlate to a damaged vehicle with a reduced value.

      c.     *Access Establishes Klem Did Not Meet His Burden As To Falsity*

Access argues Klem did not provide evidence the REG 481 notice was knowingly or recklessly false. Klem's position is that the REG 481 notice sent to the DMV by Access was false, primarily because he intended to and did repair his Vehicle. Klem also appears to contend that because Access was not his insurer, it could not make the total loss salvage determination. As we shall explain, Klem's contentions lack merit and

27

Access establishes Klem provided no evidence that the REG 481 notice sent to the DMV was false.

        i.     *Meaning Of "Total Loss Salvage Vehicle" Under Section 544(a)*

We begin with a statutory interpretation issue: the meaning of "total loss salvage vehicle." Because there was no agreed-upon settlement, the Vehicle could only have been a total loss salvage under section 544, subdivision (a). "Our primary task in interpreting a statute is to ascertain the Legislature's intent so that we may adopt an interpretation that best gives effect to the purpose of the statute. [Citations.] We examine the entire substance of a statute and the scheme of law of which it is a part to determine its scope and purpose, construe its words in context and harmonize its various parts." (*Varshock v. Department of Forestry & Fire Protection* (2011) 194 Cal.App.4th 635, 641 (*Varshock*).) "[W]e look first to the words of the statute, ' "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' [Citation.] Although we give effect to a statute according to the usual, ordinary import of its language [citations], language that permits more than one reasonable interpretation allows us to consider 'other aids, such as the statute's purpose, legislative history, and public policy.' " (*Cortez v. Abich* (2011) 51 Cal.4th 285, 292.)[14] We review statutory interpretation issues de novo. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432.)

---

14    Access addresses a portion of the legislative history in its briefing. On our own motion, we take judicial notice of documents comprising the legislative history of these

28

Total loss salvage status results under section 544, subdivision (a), when one of the identified persons "considers it uneconomical to repair the vehicle and because of this, the vehicle is not repaired by or for the person who owned the vehicle at the time of the event resulting in damage."  In *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46 (*Martinez*), our colleagues in the Fifth Appellate District determined that a vehicle is uneconomical to repair where "the cost of repairs exceeds its predamage retail value," and we find their interpretation persuasive.  (*Id*. at p. 56.)[15]  Here, there is no dispute Access considered the vehicle to be uneconomical to repair.  Our focus, then, is on the meaning of "because of this, the vehicle is not repaired by or for the person who owned the vehicle . . . ."

This portion of section 544, subdivision (a), could be read to mean that a vehicle can only be a total loss salvage when there is no repair, by any party.  However, "language that appears clear and unambiguous on its face may be shown to have a latent ambiguity when some extrinsic factor creates a need for interpretation or a choice between two or more possible meanings.  [Citations.]  A latent ambiguity exists where, for example, a literal interpretation of a statute would frustrate rather than promote the purpose of the statute . . . ."  (*Varshock, supra*, 194 Cal.App.4th at p. 644.)  We find such

_____

statutory provisions and related statutes.  (Evid. Code, §§ 452, 459; see *In re Donovan L., Jr.* (2016) 244 Cal.App.4th 1075, 1088.)

15    We are aware *Moran*, *supra*, 139 Cal.App.4th at pp. 692-693 characterized the *Martinez* court's analysis of section 544 as dicta.  Regardless of why *Martinez* reached the issue, we find its analysis persuasive.  (*Masry v. Masry* (2008) 166 Cal.App.4th 738, 741 ["Dicta may not decide a case but can be persuasive and influence later cases."].)

an ambiguity here. Section 544, subdivision (a), contemplates a person will consider a vehicle uneconomical to repair, and "because of this," not repair it. It does not envision someone nevertheless will elect to repair the vehicle, and its application in that scenario is ambiguous.

Reading section 544, subdivision (a), as a whole, we conclude the only reasonable interpretation is that repair following an uneconomical-to-repair determination does not preclude total loss salvage status. The inclusion of the term "because of" prior to the language concerning repair supports this view. " 'Because of' . . . connotes a causal link . . . ." (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744; *Gross v. FBL Fin. Servs.,* (2009) 557 U.S. 167, 176 [dictionary definition of "because of" means " 'by reason of: on account of' "].) Interpreting "is not repaired" to encompass repair decisions, regardless of their connection to the uneconomical-to-repair determination, would render the words "because of" superfluous. (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 ["A construction making some words surplusage is to be avoided."].)

This interpretation is consistent with the purposes of salvage vehicle reporting, as reflected in the legislative history. When section 544 was enacted, the "main objective" of the salvage law was to "identify total loss salvage vehicles apart from operable vehicles," while also addressing concerns regarding safety, fraud, theft, and "vehicles that were improperly repaired . . . ." (Dept. of Motor Vehicles, Enrolled Bill Rep., Assem. Bill No. 2546 (1979-1980 Reg. Sess.) July 15, 1980.) Designating a vehicle as a total

30

loss salvage once it is found uneconomical to repair (and, impliedly, not yet repaired) enhances disclosure and minimizes the number of improper repairs.[16]

This interpretation conforms to other Vehicle Code provisions regarding total loss salvage vehicles, which essentially assume that if repair occurs, it happens later and pursuant to certain requirements. Section 4453 requires registration cards to identify "[a] motor vehicle rebuilt and restored to operation that was previously declared to be a total loss salvage vehicle because the cost of repairs exceeds the retail value of the vehicle." (§ 4453, subd. (b)(1); see *Martinez*, *supra*, 119 Cal.App.4th at p. 55 [explaining that "defining a 'total loss salvage vehicle' under section 544 as one where the cost of repairs exceeds the vehicle's predamage fair market value is consistent with section 4453."].) See also section 5505 (registration requirements for vehicles reported as total loss salvage vehicles, including inspection), and section 521.5 (defining "[r]evived salvage vehicle" as a "total loss salvage vehicle as defined in [§] 544 . . . that has been rebuilt or restored to legal operating condition").

---

16    The legislative history also appears to reflect the assumption that vehicles that are uneconomical to repair will not be repaired. (See, e.g., Assem. Transportation Com., analysis of Assem. Bill No. 4086 (1975-1976 Reg. Sess.) May 4, 1976 [predecessor bill enacting provision substantially similar to § 544, subd. (a) as part of former version of § 11515; indicating total loss is defined by being "damaged beyond economical repair"]; Dept. of Motor Vehicles, Enrolled Bill Rep., Assem. Bill No. 1718 (2003-2004 Reg. Sess.) [bill adding "responsible for" to § 544, subd. (a); explaining current law defines total loss salvage as "vehicle . . . damaged to the extent that the owner . . . or the insurance company that insured the vehicle considers it uneconomical to repair."]; *ibid.* [bill would "allow the person responsible for repair of the vehicle to make the decision as to whether the vehicle is uneconomical to repair and whether or not it is repaired"].)

Finally, interpreting section 544, subdivision (a), to focus on whether a vehicle is uneconomical to repair (not whether someone wants to repair it, regardless) promotes the effective operation of the salvage laws. *Martinez* is again instructive. There, the Court of Appeal rejected the argument that the term "considers" in section 544, subdivision (a), rendered the uneconomical-to-repair determination subjective. The court explained:

> "The reasonable interpretation of section 544 requires that 'total loss salvage vehicle' status be objectively determined. Otherwise, the label is meaningless. 'Uneconomical to repair' decisions based on individual considerations would necessarily be inconsistent and therefore provide limited information. Such a result does not conform with the object of this statutory scheme, i.e., consumer protection."

(*Martinez, supra*, 119 Cal.App.4th at p. 55; *id.* at p. 56 ["In sum, a 'total loss salvage vehicle' as defined by [§] 544 is one where . . . it is 'uneconomical to repair.' "].) The Court of Appeal confirmed an objective standard must apply:

> "[W]hether the vehicle qualifies as [uneconomical to repair] is established by objective standards. The retail value can be obtained from a widely accepted source such as the Kelley Blue Book. Cost of repairs can be ascertained through estimates from qualified mechanics." (*Ibid.*)[17]

---

[17]     See also *Royal Auto Parts v. State* (1982) 118 Mich.App. 284, 290 (interpreting similar statute; "The statutory definition cannot reasonably be interpreted to mean that individual considerations can be taken into account in making the determination of whether a vehicle is distressed."); cf. *Hill v. Mercedes-Benz USA, LLC* (2005) 274 Ga.App. 826, 828-830 (warranty action; owner's opinion on vehicle value insufficient when based on vehicle's usefulness to her rather than fair market value). We recognize unique value to an owner may be relevant in other contexts. (See, e.g., *SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 562 [damages relating to real property].) However, for the reasons discussed herein, an objective standard is necessary for determination of total loss salvage status.

32

For similar reasons, the total loss salvage determination cannot reasonably turn on a person's subjective assessment that a vehicle has been repaired. Indeed, the impact on salvage vehicle identification and the risk to consumer protection is even greater in such circumstances. Not only could owners introduce delays in total loss salvage reporting (by postponing the repair decision), but when they did decide to repair, it could result in improperly repaired vehicles remaining on the road without disclosure.

We address a remaining interpretation issue. Klem suggests section 544, subdivision (a), applies only when the claimant is an insured or a member of the insured's household. As noted *ante*, section 544, subdivision (a), was amended to change "the insurance company that insured the vehicle" to "the insurance company that insured *or is responsible for repair of* the vehicle." (Stats. 2003, ch. 451, § 4, italics added.) Because the statute already covered the insurer of the vehicle, the new language necessarily referred to other entities—and reasonably encompasses an insurer that agrees to pay for damages. (See Dept. of Motor Vehicles, Enrolled Bill Rep., Assem. Bill No. 1718 (2003-2004 Reg. Sess.) [discussing total loss determination "by the insurance company (of the owner or the one paying for the damages)"].) Klem's reliance on Insurance Code section 660 here is misplaced; that section provides definitions with respect to cancellation or failure to renew certain insurance policies, and is inapposite. We also reject his claim that Access misrepresented its status as the insurer responsible for repair, and his request that we require Access to prove it insured every person and vehicle in California to avoid sanctions.

33

ii.	*Access Establishes Klem Provided No Evidence Its REG 481 Notice Was False*

We now turn back to Access's argument that Klem does not establish the REG 481 notice was false, and conclude it has merit.

Access's total loss salvage determination was consistent with section 544, subdivision (a). Access accepted liability for the accident, and therefore was "responsible for repair" and able to make the total loss determination. It then completed a total loss evaluation and concluded the vehicle was a total loss salvage. Rather than repairing the vehicle or paying to do so, Access provided Klem with a total loss payment. Thus, when Access submitted the REG 481 notice to the DMV, it could truthfully represent therein that the Vehicle was a total loss salvage.

Klem does not provide evidence the REG 481 notice was false. As noted *ante*, he relies primarily on his repair of the Vehicle and the fact that Access is not his insurer. The only evidence of repair appears to be statements in his declaration that he intended to and did repair his vehicle. Section 544, subdivision (a), does not accord any significance to intended repair. Even assuming Klem repaired the Vehicle, that repair was not "because of" the uneconomical-to-repair determination (but, rather, notwithstanding it). The statements also do not constitute the kind of objective evidence needed for total loss determinations. (*Martinez*, *supra*, 119 Cal.App.4th at p. 55.) As for Access's relationship with Klem, there is no dispute it was not his insurer, but it did not have to be. (§ 544, subd. (a) ["insurance company that insured *or is responsible for repair of* the vehicle"], italics added.)

In addition, although Klem does not appear to rely on the Vehicle's value to establish falsity, he does state he did not consider the Vehicle to be uneconomical to repair. If Klem did rely on value, his evidentiary showing likewise would be deficient. His only evidence is his $4,500 estimate (again, in his declaration), with no indication this was based on the Kelley Blue Book or some other objective source. Indeed, he indicates the Vehicle had "unique value," suggesting the estimate was based on subjective factors. Klem also provided no evidence of the cost of repair. This evidence also would not call into question Access's assessment that the Vehicle was uneconomical to repair, or, in turn, show its REG 481 notice to be false. (*Martinez*, *supra*, 119 Cal.App.4th at p. 55.)[18]

---

[18] In what seems to be another argument that the Vehicle was not a total loss salvage, Klem contends permitting owners to repair is consistent with constitutional property rights and such rights cannot be delegated to insurers. He does not support these arguments with relevant legal authority, and we treat them as waived. (*Cahill*, *supra*, 194 Cal.App.4th at p. 956.) Regardless, the issue is vehicle operation (i.e., whether a vehicle can be operated without a salvage title), not property rights; such operation is not a fundamental right; and restrictions have been upheld as constitutional. (See, e.g., *Anacker v. Sillas* (1976) 65 Cal.App.3d 416, 423-425 [driving not a "fundamental right"; financial responsibility statute was constitutional].) The role of insurers in making total loss determinations does not change that analysis.

d. *Access Establishes Klem Did Not Meet His Burden As To Pecuniary Damage*

Access contends Klem has not shown a direct and immediate pecuniary loss. We agree Klem did not establish any pecuniary loss from Access's sending of the REG 481 to the DMV.

"In an action for wrongful disparagement of title, a plaintiff may recover (1) the expense of legal proceedings necessary to remove the doubt cast by the disparagement, (2) financial loss resulting from the impairment of vendibility of the property, and (3) general damages for the time and inconvenience suffered by plaintiff in removing the doubt cast upon his property." (*Seeley v. Seymour* (1987) 190 Cal.App.3d 844, 865, fn. omitted.)

Klem's complaint alleged multiple sources of damages: "loss of value due to the slander of title"; "loss of the use of the vehicle"; "incurr[ence] [of] rental expenses" due to loss of use and "lack of ability to properly register the vehicle"; and being required to "retain counsel in an attempt to mitigate the damages and to remove the salvage title statutes of the vehicle" [*sic*].

First, Klem has not established any value loss due to Access's submission of the REG 481 notice to the DMV. As discussed *ante*, whatever value reduction he experienced here was caused by the accident. Indeed, even if Klem had never filed a claim with Access, or had withdrawn it, he still would have been responsible for determining and reporting total loss salvage status. (§ 11515, subds. (c), (g).) Second, Klem has not identified any loss of use of the Vehicle caused by the submission of the

36

REG 481 notice. Klem continued driving the Vehicle. It was only when the Vehicle developed the unrelated engine problem that Klem declined to repair it (purportedly due to the need for salvage title) and sold it for salvage. But, again, the Vehicle's salvage status resulted from the accident, not from the sending of the REG 481 notice, and a car can be driven with a salvage title. Third, Klem has identified no competent evidence of rental expenses due to Access's filing of the REG 481 notice. Finally, because Klem has not established the REG 481 notice was false, or any damages resulting from it, he has not demonstrated he needed to retain counsel to clear the Vehicle's title or mitigate damages.

3.     *Access Establishes Klem Could Not Prevail On His UCL Claim*

Access argues Klem cannot establish his UCL claim because, among other reasons, he did not establish actual injury. We agree. Klem has not established a likelihood of prevailing on this claim, and the trial court erred in concluding otherwise.

" 'Actions for relief' under the UCL may be brought by various government officials and 'by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.' (Bus. & Prof. Code, § 17204.)" (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 954 (*McGill*).) The California Supreme Court has construed "lost money or property" to mean that a private plaintiff "must demonstrate some form of economic injury." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 323.)

In Klem's UCL cause of action, he alleges generally that he suffered "injury in fact and . . . lost money and property," and reiterates his assertions regarding Access's

37

purported wrongdoing, but he does not identify any specific economic injury for purposes of the UCL claim. Nor did he do so in his opposition to Access's anti-SLAPP motion, or his respondent's brief here. Even if we consider the allegations and evidence provided in support of the slander of title claim, they do not reflect economic injury due to Access's communication. Thus, Klem has not demonstrated the standing necessary to pursue his UCL claim. We need not reach Access's other arguments regarding Klem's failure to meet his burden on this claim.[19]

---

[19] Access's other arguments were that Klem did not satisfy class action requirements or establish a tether to an existing law or public policy. We note *McGill* was decided after briefing here and determined, inter alia, that a plaintiff who suffered injury in fact was not precluded from seeking public injunctive relief in an individual action. (*McGill*, *supra*, 2 Cal.5th at p. 959.) We obtained supplemental briefing from the parties on the decision. However, because Klem has not established injury, we conclude we need not address *McGill*'s application here.

DISPOSITION

The order is reversed, and the matter is remanded to the superior court with directions to vacate the order and enter a new order granting Access's special motion to strike.  Access is awarded its costs on appeal.

IRION, J.

WE CONCUR:


BENKE, Acting P. J.


HUFFMAN, J.